# THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 14

OCTOBER TERM, A.D. 2022

February 6, 2023

CHRISTOPHER DAVID TARPEY,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-21-0234, S-22-0167

*Appeal from the District Court of Teton County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellant:*
Devon Petersen of Fleener Petersen, LLC, Laramie, Wyoming.
Argument by Mr. Petersen.

*Representing Appellee:*
Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; and Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    Following a jury trial, Christopher Tarpey was convicted of one count of first-degree sexual assault. On appeal he contends the district court violated his Sixth Amendment right to a public trial, the district court committed plain error when it admitted a recording of the victim's statement to the police, and he received ineffective assistance of counsel. We affirm.

## ISSUES

[¶2]    Mr. Tarpey raises three issues, which we rephrase as follows:

> I.      Did the district court violate Mr. Tarpey's Sixth Amendment right to a public trial?
>
> II.     Did the district court commit plain error by admitting the recording of the victim's statement to the police?
>
> III.    Did Mr. Tarpey receive ineffective assistance of counsel?

## FACTS

[¶3]    On July 26, 2020, Sergeant Russ Ruschill of the Jackson Police Department received a call from BS who informed him Christopher Tarpey sexually assaulted her in the early morning hours of July 23, 2020. Sergeant Ruschill recorded his telephone interview of BS with his body camera. On December 10, 2020, the State charged Mr. Tarpey with one count of sexual assault in the first degree. He pled not guilty at his arraignment, which was conducted by videoconference with Mr. Tarpey's consent.

**Pretrial Proceedings and Covid-19 Protocols**

[¶4]    The district court set Mr. Tarpey's trial for five days, beginning on June 1, 2021. The district court's scheduling order informed the parties the trial would be conducted in compliance with its Covid-19 jury trial plan, and it required the parties to file any objections to those protocols by March 26, 2021. Mr. Tarpey did not file any objections to those protocols. The scheduling order also required the parties to submit a stipulated exhibit list. The parties filed an exhibit list that indicated they stipulated to the admission of "select excerpts" of the recording of Sergeant Ruschill's phone interview with BS, which was identified as Exhibit 1/MM. The exhibit list did not identify which excerpts the parties intended to play.

[¶5]    The district court addressed its Covid-19 protocols at the pretrial conference held on May 7, 2021. The district court indicated it would be "taking every reasonable

1

precaution" to protect the jurors, including socially distancing all the participants. The district court stated the courtroom could not accommodate more than three people at each counsel table, and any other people who wanted to attend the trial would have to do so by a video link. Mr. Tarpey did not object at that time. The district court issued an order following the pretrial conference, which incorporated the district court's pandemic jury trial plan and stated: "Counsel are directed to review that plan and raise any questions at any upcoming conferences." The order reiterated that due to the size of the courtroom, three people could sit at counsel tables, and "[a]ll other support staff, co-counsel, investigators, friends, family, Victim Services staff, etc. may attend by videoconference link."

[¶6]   The district court held another pretrial hearing on May 25, 2021. At this hearing, the State asked the district court if it had decided how it would be broadcasting the trial to the public. The following discussion then took place:

> THE COURT: The short answer is, no. I could get your -- what are your thoughts about -- the easiest way to do this is there's a streaming capability audio only through the Supreme Court website and some judges have done that. And obviously you don't have the video.
>
> The other two choices for video are either full streaming to YouTube or let people know how they could tune in through Microsoft Teams. They each have their problems. However, [the court reporter] and I are talking about -- at least this would have to happen after voir dire because we wouldn't have enough space otherwise. But we're talking about the possibility of actually putting a Hub probably up there on the jury box so that we could maybe get it at an angle that would get the witness and the judge and the lawyers.
>
> It would be kind of a long distance view, but at least it would be a visual view. And we think we might be able to do that without showing who the jurors are, which I want to avoid. So, that's an option we are working on this week.
>
> Anybody have any recommendations?
>
> [DEFENSE COUNSEL]: We anticipate that the defense would be requesting sequestration. We'd have to make sure that witnesses wouldn't be streaming in and attending.
>
> THE COURT: Yeah, that's tricky, isn't it?

2

So, you know, upon request I am to issue a sequestration order, it's not a discretionary thing. And so upon request I issue it and then it's impossible for the [c]ourt to really police that, it's up to the parties. And so you'd have to make sure that all of your witnesses know that that's listening on anything.

However, it would be broadcast would be a violation of the sequestration order and then as officers of the court if you found out there was a problem you'd have to let us know. But I think that's probably a risk under any of the three modes of transmission.

[THE STATE]: Your Honor, the state prefers the audio only version. That's my preference.

THE COURT: Okay. And other than your comment, [defense counsel], do you have any preference?

[DEFENSE COUNSEL]: No.

THE COURT: Okay.

[DEFENSE COUNSEL]: Just it's going to be difficult. Thank you.

[¶7] The district court conducted a final pretrial hearing on May 28, 2021. The district court indicated it made arrangements with the District Court Clerk to post a notice about the audio broadcast on the Clerk's website and at the front of the courthouse, so there would be "reasonable public access in that regard."

[¶8] The district court issued an order after the pretrial hearings. This order set forth the district court's reason for limiting public access to the trial and for using the audio broadcast rather than a video link:

17. Public Access. As the [c]ourt's jury trial plan indicates, public access to the trial would occur remotely. Due to the size of the courtroom, there is no space for public access during the trial while accommodating physical distancing for the jurors. The [c]ourt noted at the May 25 hearing that the video feed, if a video broadcast were used, is not optimal for showing all trial participants, protecting the privacy of the jurors, or both. The [c]ourt was considering using an audio-only feed, used by the

3

Wyoming Supreme Court and other trial courts in Wyoming. Both parties requested the audio-only feed be used.[1]

18. The Sixth Amendment's right to a public trial right was made applicable to the states in *In re Oliver*[,] 333 U.S. 257, 270 (1948). A public trial is "for the benefit of the accused" so "the public may see he is fairly dealt with and not unjustly condemned," which has the effect of "keeping his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.* However, the right to a public trial is not absolute. In *Waller v. Georgia*, the Supreme Court set forth a four-part test for trial courts to use to determine whether a courtroom closure is appropriate. 467 U.S. 39 (1984). A closure is appropriate when: (1) the party (or in this case, the court), seeking to close the proceeding must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) the court must make findings adequate to support the closure.

19. The First Amendment also provides the right of public and media access to trial proceedings. *Press-Enterprise Co. v. Superior Court of Cal. For the Cnty. of Riverside*, 478 U.S. 1 (1978). A First Amendment right to access criminal proceedings[] exists if (1) "the place and process have historically been open to the press and general public," and (2) "public access plays a significant role in the functioning of the [p]articular process in question." *Id.* at 8.

20. In this case, the criminal trial is open to the public. The difference from an ordinary criminal trial is that the public and media cannot attend in person. The public and media can attend remotely. Some courts, when evaluating a partial closure, have applied a less stringent test than that announced in *Waller. E.g., Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001).

---

[1] This statement is technically incorrect. As set out above, the State requested the audio broadcast, and defense counsel stated he did not have a preference as to whether the district court utilized the audio broadcast or a video link. While defense counsel did not affirmatively request the audio broadcast, he also did not affirmatively object to its use.

21. Applying the more stringent *Waller* factors in this case, the overriding interest is one of public health, namely an airborne virus (COVID-19) easily transmitted by aerosols emitted when a person speaks or breaths, although respiratory droplets by sneezing or coughing and fomite transmission through touched surfaces are also recognized means of transmission. One of the several scientifically-recognized tools to reduce contagion of the airborne virus is to physically distance people six feet apart. The District Courtroom is small. It can accommodate the necessary number of jurors and litigants for trial with physically distanced seating. But the space is too small to allow more than the jurors, court staff, attorneys, and parties. To allow open access for in-person attendance by the public and the media would preclude physical distancing and therefore increase the public health risk to the jurors and trial participants. The [c]ourt therefore finds that the overriding interest of public health warrants a change to the public access procedures for this case.

22. To provide public access, the [c]ourt has considered (1) a live videostream of the trial available online through YouTube or a similar platform, (2) a live [videostream] of the trial by invitation to the video conference meeting (as the [c]ourt has used for bench trials during the pandemic), and (3) a live audiostream to the trial. The Wyoming Supreme Court and several other Wyoming trial courts use the audiostream option. After testing the video capabilities of existing courtroom technology, it is apparent that the available angles for the videostream in the small courtroom are inadequate for a jury trial. The video option has worked well for bench trials, all of which have occurred remotely during the pandemic. For the few in-person proceedings that have occurred during the pandemic, the video option has also worked well since the bench proceedings necessarily have a much smaller volume of courtroom participants. As a result, the video angles are appropriate and adequate. For a jury trial, they are not.

23. After testing the available options for a jury trial, the [c]ourt must find that the live audiostream is the only feasible and practical option at this time. As the only feasible option, the audiostream is narrowly tailored. As noted above, the [c]ourt has considered the other available options and found them unworkable at this time after testing.

5

24. With respect to the Sixth Amendment, it is notable that the Defendant, whose right it is to have a public trial, did not oppose the audiostream options and joined in the State's preference to use that option. With respect to the First Amendment, the audiostream option is narrowly tailored to serve the interest of public health.

[¶9]     At the beginning of voir dire, the district court informed the jurors that due to Covid-19, members of the public could not be seated in the courtroom, but the trial was being broadcast to the public through the Supreme Court's website. At the end of voir dire, the district court again reminded the parties it intended to stream the trial through the audio broadcast. Neither the State nor defense counsel objected to the use of the audio broadcast.

**Presence of Victim's Advocate**

[¶10]   About a week before trial, the State filed its second amended witness and exhibit list, which contained the following request:

> ***The State requests the [c]ourt consider allowing the victim's advocate to be present in the courtroom, in close proximity to [BS] while she testifies in this matter, for the duration of her testimony, as it is critical under the [] Victim's Bill of Rights, W.S. § 1-40-201 et seq.[,] the victim be free from any form of harrassment [sic], intimidation, or retribution, especially related to the victim being accompanied into the courtroom and when giving testimony. W.S. § 1-40-205. The State has consulted counsel for the Defendant who stipulates to the victim's advocate being present while the victim testifies in this matter, which includes entering and exiting the courtroom at any time.***

Toward the end of the hearing on May 28, 2021, defense counsel asked the district court how it planned to handle the victim's advocate being present during BS's testimony. The following exchange occurred:

> THE COURT: So, would it be okay -- since there's not going to be anybody up in the jury, there is a chair . . . in front of the jury. I don't know if you want to be able to see her during the testimony, but if you come up here and see -- if you look.
>
> [DEFENSE COUNSEL]: I can see a corner of the chair.

6

THE COURT: It's basically over there. So, it wouldn't distract the jury because she would be hidden by that partial partition. That would be the most inconspicuous place for her. Is that acceptable?

[DEFENSE COUNSEL]: Yeah. It sounds like it would be. Yes, sir.

THE COURT: Is that okay?

[THE STATE:] Yes, Your Honor. And to the point I guess the next question is would the [c]ourt be explaining her presence and her role or would you like the state to do that? Seems like it's . . .

THE COURT: **Since there's no objection**, I think it would be appropriate for you to just explain that she's there in a supportive role and not to, you know, coach the witness or anything like that. Just in a supportive role as an advocate, probably not a victim's advocate. And I think that would be fine.

[THE STATE]: Thank you, sir.

THE COURT: Sure.

(Emphasis added). Defense counsel did not object either orally or in writing to having the prosecutor explain the reason for the advocate's presence or to the district court's proposed seating arrangement.

[¶11]   At the trial, the State called BS as its first witness. Prior to BS's testimony, the State made the following statement regarding the reason for the advocate's presence:

And before I begin my examination with this witness, I would like to point out for the record and for the jury that [AH] has joined us in the courtroom. [AH] is an advocate for the witness and will be sitting near her for the duration of her testimony. She will not be coaching the witness, but rather present in a supportive role. The defendant has agreed to [AH] being present.

Defense counsel did not object to this statement or request a limiting instruction.

7

[¶12]  Toward the end of the trial, the State asked the district court to allow BS and her advocate to be present in the courtroom during closing arguments and suggested they sit at the end of the jury box.  The district court indicated it had never excluded witnesses from attending closing arguments, and it asked for the defense's position on the matter.  Defense counsel stated he was aware of the victim's rights, and he thought it would be appropriate for BS to be present if she was cautioned not to display any emotions during the closings.  The district court then discussed where BS and her advocate could sit, and it proposed BS be placed "where she's not really in sight of the jury and still able to hear everything."  The State then mentioned it thought BS "would like to be present and be visible."  Defense counsel stated he would prefer BS sit in the chair her advocate had occupied during BS's testimony.  Both BS and the advocate were present during closing arguments, although the record is unclear on where they were seated.

**Evidence Adduced at Trial**

[¶13]  BS testified she worked at a custom hat shop in Jackson, Wyoming, and she went there on the afternoon of July 22, 2020, to hear a musician perform a private concert.  When she arrived, a group of her friends were already there.  Mr. Tarpey arrived later.  BS had previously met Mr. Tarpey because she often went to the barbeque restaurant where he worked as a bartender.  The group stayed at the hat shop for 60–90 minutes drinking alcohol, listening to music, and eating food.  The group left the hat shop and went to Miller Park to play a game, which BS referred to as "alcoball."  They later returned to the hat shop and consumed more alcohol.  The group then walked across the street to the Cowboy Bar, where they consumed more alcohol.  BS gave Mr. Tarpey her phone number because she thought he wanted to be friends.  The group left the Cowboy Bar after last call, and they returned to the hat shop.  Shortly thereafter, BS walked home alone.

[¶14]  In the early hours of July 23, 2020, BS and Mr. Tarpey exchanged text messages and decided he would come over to her house to smoke marijuana and watch a movie.  BS informed Mr. Tarpey she did not want to have sex, and he replied he "never said anything about sex[.]"  Mr. Tarpey then sent BS a message saying: "You better be naked when I come in[.]"  BS testified she did not take this message seriously, and she tried to treat it as a joke by replying "lol naked[.]"

[¶15]  Mr. Tarpey arrived at BS's house around 2:00 a.m.  BS testified Mr. Tarpey appeared to be more intoxicated and "zombie-like."  Shortly after arriving, Mr. Tarpey pulled BS down onto her bed and removed his clothing.  Mr. Tarpey removed BS's clothing in a "slightly aggressive" manner.  BS told Mr. Tarpey to "chill out" and asked him what he was doing.

[¶16]  He positioned her so that she was laying on her back on the left side of the bed and got on top of her.  She was not able to get up because he was a lot bigger than she was, he was holding her down with his weight, and she was starting to get scared.  Mr. Tarpey

attempted to have sexual intercourse with her, and he did not stop when she told him to "chill out." When Mr. Tarpey was unable to penetrate her, he struck BS on the right side of her face with the heel of his hand and told her to "Take it, b*tch."

[¶17] BS suggested they stop trying to have sex. He then grabbed her and repositioned her while saying something that she took as a command to perform oral sex. BS submitted to performing oral sex because she preferred that to being forced to have sexual intercourse with him or being struck in the face again. While she was performing oral sex on Mr. Tarpey, she felt him put his fingers inside her vagina. She did not want him to do this, and she asked him to stop, but he did not stop.

[¶18] Mr. Tarpey then repositioned her, so she was straddling him. He struck her on the right side of her face again with the heel of his hand. She then felt his penis penetrate her vagina. Mr. Tarpey wrapped his hands around her thighs and pulled her legs down onto his waist. Mr. Tarpey also bit her right ear. The assault lasted about 15 minutes, and it ended when Mr. Tarpey passed out in her bed.

[¶19] BS did not reach out to anyone immediately after the assault because she did not know who to call, she was in shock, and she did not know what to do. She eventually fell asleep on her bed. They both awoke around 10:00 a.m. Mr. Tarpey told BS he was hungover, and he then proceeded to place an online order for breakfast. BS wanted to get him out of her house, so she drove him to pick up his breakfast. They shared a small, strange embrace and parted ways. After she parted from Mr. Tarpey, BS drove home.

[¶20] Over the next couple of hours, BS and Mr. Tarpey exchanged the following text messages:

> [BS] Yo I am going to be very chill about this but that was absolutely uncool. You need to understand that I said in writing and out loud, I DO NOT want to have sex with you, I wanted to get high and watch a movie. You didn't even bring weed after saying you would. I asked you to stop fingering me multiple times. I literally was giving you head so that you wouldn't f*ck me or HIT ME IN THE FACE again. I have a bruise on my face dog. You're my homie so it's all good we can get juice together and sh*t but understand I was uncomfortable and not in control whatsoever because you were at my crib and I'm not the kinda person to ask one to leave. This never gets talked about again and never happens again. Mad love, enjoy your hangover!
>
> [TARPEY] So sorry

[TARPEY] That's not who I am. I promise

[BS] No that is who you are. And you're a lot bigger than me. That was scary for me.

[TARPEY] I promise that's not me. I feel so bad

[TARPEY] Can't apologize enough

[TARPEY] Alcoball was not good for my knee. Walking around like a geyser [sic] sh*t is throbbing so bad

[BS] stop texting me I don't think you get what you did to me last night

[BS] I do not f*ck with you. I kept it so cool just to get you out of my f*cking house. Are you on pills or something?

[TARPEY] I'm not on pills I was really drunk. I'll leave you be. Sorry again

Later that day, BS reached out to a friend and told him what happened. BS did not think about calling law enforcement immediately after the assault, but she did consider it in the following days. On July 26, 2020, BS called the Jackson Police Department to report the assault, and Sergeant Ruschill interviewed her by phone because she was too upset to come to the station in person.

[¶21]   After BS's direct testimony, but before she was cross-examined, the State moved to introduce the recording of her phone interview with Sergeant Ruschill into evidence. Defense counsel did not object, and the district court admitted the recording. The State then started playing the 42-minute recording for the jury. The State stopped playing the recording approximately 33 minutes into the video and requested a bench conference. The State offered not to play the rest of the recording. Defense counsel stated he stipulated to the admission of the recording, and he insisted the entire recording be played to the jury. The district court stated:

> Well, by stipulating to this going into evidence I would think that the defendant would be giving up any objections and appeal issues on this. . . . But it's already been stipulated to. I don't know that on a plain error standard, I'm not sure that it violates any unequivocal rule of law. So, I think it's okay. So, I'll go ahead with the stipulation and allow it to be played, but appreciate your heads-up on that.

10

[¶22]   In her recorded interview, BS told Sergeant Ruschill she had been sexually assaulted by Mr. Tarpey.  Sergeant Ruschill told her he was going to ask her questions, he would believe everything she told him, and she was in complete control and could end the interview at any time.  Most of what BS told Sergeant Ruschill was consistent with her trial testimony.  However, she told him that Mr. Tarpey did penetrate her once before he forced her to perform oral sex.  BS also told Sergeant Ruschill she had been laid off from her job in Colorado due to Covid-19, and she was not working in Wyoming.  She also stated she did not know Mr. Tarpey well, and she did not know where he worked.

[¶23]   On cross-examination, defense counsel attacked BS's credibility with portions of her recorded statement.  BS admitted that at the time she was interviewed by Sergeant Ruschill, she did indeed know where Mr. Tarpey worked, and she had met him on numerous occasions before July 22, 2020.  BS also admitted she lied to Sergeant Ruschill about being unemployed.  BS testified she was collecting unemployment from Colorado, and she was nervous to tell law enforcement she was also being paid in cash under the table while in Wyoming because she thought she might get in trouble.  Defense counsel also asked BS if she used any drugs on the night of the alleged assault.  BS initially denied using drugs before admitting she used cocaine with Mr. Tarpey at the hat shop that night.

[¶24]   A Sexual Assault Nurse Examiner [SANE] examined BS at the emergency room on July 27, 2020.  The sequence of events BS relayed to the nurse differed slightly from what she had told Sergeant Ruschill and her trial testimony.  BS told the nurse Mr. Tarpey did penetrate her while he was on top of her, he then repositioned her so she was on top of him, before repositioning her again and commanding her to perform oral sex.  BS told the nurse Mr. Tarpey grabbed her legs when he was trying to force himself in her, bit her right ear, and grabbed her neck.  The nurse observed, measured, and made note of the injuries on BS's body.  The nurse observed bruising on the back of BS's thighs, a bruise above her left knee, a scratch on her left thigh, a bruise on her right cheekbone, a red area on the right side of her neck that was painful to the touch, and a red area behind her right ear with a small scab.

[¶25]   Mr. Tarpey testified after he arrived at BS's house, they attempted to engage in consensual sexual intercourse, and the encounter ended when he could not perform sexually. He denied grabbing BS by her thighs or holding her down. He also denied hitting BS in the face and calling her a b*tch. He said BS never told him to stop or chill out, nor did she say she did not want to have sex. He testified when he replied to her messages by saying he was sorry, he was not apologizing. Instead, he was reaching out to her for an explanation because he did not understand the allegations she was making against him.

[¶26]   In his closing argument, defense counsel pointed out several things that called BS's credibility into question: she lied about not knowing Mr. Tarpey before that night; she lied about not knowing where he worked; she lied about her drug use; and she lied about

working and getting paid under the table while collecting unemployment. Defense counsel also asked the jury to consider how BS's statements to Sergeant Ruschill and the SANE nurse differed from her trial testimony, and he claimed the "core details" were different in each account.

[¶27] The jury found Mr. Tarpey guilty of sexual assault in the first degree. Mr. Tarpey was subsequently sentenced to imprisonment for not less than 10 nor more than 15 years. He timely appealed his conviction and sentence.

**Motion for a New Trial**

[¶28] While his direct appeal was pending, Mr. Tarpey filed a motion for a new trial based on ineffective assistance of trial counsel pursuant to Rule 21 of the Wyoming Rules of Appellate Procedure (W.R.A.P.). We stayed his first appeal pending the district court's decision on his W.R.A.P. 21 motion.

[¶29] Mr. Tarpey's W.R.A.P. 21 motion set forth six grounds he asserted constituted ineffective assistance of counsel: 1) trial counsel misunderstood the rules of evidence regarding the admission of character evidence; 2) trial counsel stipulated to the admission of the recording of BS's phone interview with Sergeant Ruschill and allowed it to be played in open court; 3) trial counsel stipulated to the victim's advocate sitting next to the BS during her testimony, and did not object to the prosecutor telling the jury the advocate was present in a supportive role; 4) trial counsel stipulated or failed to object to nearly the entirety of the State's case; 5) trial counsel did not adequately prepare Mr. Tarpey to testify; and 6) if no ground in itself was found to be ineffective assistance, when taken together, they amounted to ineffective assistance of counsel that prejudiced Mr. Tarpey. Mr. Tarpey attached an affidavit to his motion, which set forth his allegations relating to his trial counsel's misunderstanding of character evidence and his opinion as to how he was inadequately prepared to testify.

[¶30] Prior to the hearing on his W.R.A.P. 21 motion, Mr. Tarpey filed a witness list, which indicated he intended to call three witnesses who were expected to testify about "Mr. Tarpey's reputation for character traits pertinent to the charges in this case and his theory of defense, such as peacefulness, truthfulness, and respect for women." Mr. Tarpey attached "declarations" from these character witnesses to his witness list.

[¶31] Mr. Tarpey did not testify at the W.R.A.P. 21 hearing, and the district court agreed to consider the portions of his affidavit that were based on his personal knowledge and complied with the requirements for an affidavit under Rule 56 of the Wyoming Rules of Civil Procedure. Mr. Tarpey called his trial counsel as a witness at the hearing. Mr. Tarpey also offered testimony from a retained expert who opined he was prejudiced by trial counsel's errors. Mr. Tarpey did not call any of the character witnesses to testify at the hearing, nor did he make an offer of proof as to what their testimony would have been.

12

The district court ruled it would not consider the declarations from these witnesses that were attached to the witness list.

[¶32] The district court denied the W.R.A.P. 21 motion and found Mr. Tarpey "failed to show that his constitutional rights to assistance of effective counsel were violated and/or fail[ed] to prove that he was prejudiced" by any of trial counsel's alleged deficiencies. Mr. Tarpey timely appealed the district court's order denying his W.R.A.P. 21 motion, and we consolidated his appeals.

## DISCUSSION

### I. Did the district court violate Mr. Tarpey's Sixth Amendment right to a public trial?

[¶33] Mr. Tarpey claims the district court violated his right to a public trial under the Sixth Amendment to the United States Constitution. "We review the constitutional issue *de novo*." *Dugan v. State*, 2019 WY 112, ¶ 52, 451 P.3d 731, 746 (Wyo. 2019) (citing *Kramer v. State*, 2012 WY 69, ¶ 18, 277 P.3d 88, 93 (Wyo. 2012)). "Constitutional errors are presumed prejudicial, unless this Court is convinced the error was harmless beyond a reasonable doubt." *Anderson v. State*, 2014 WY 74, ¶ 17, 327 P.3d 89, 94–95 (Wyo. 2014) (citing *West v. State*, 2013 WY 128, ¶ 12, 311 P.3d 157, 160 (Wyo. 2013)). Mr. Tarpey asserts "[t]he court's selective closure [of the courtroom] to all but BS and her advocate violated [his] right to a public trial[,]" which "constitutes structural error and requires automatic reversal and remand for a new trial." The State asserts Mr. Tarpey waived his right to challenge the use of the audio broadcast.

[¶34] A structural error "is a defect 'affecting the framework within which the trial proceeds, rather than simply errors in the trial process itself.'" *Anderson*, ¶ 20, 327 P.3d at 95 (citing *Granzer v. State*, 2008 WY 118, ¶ 16, 193 P.3d 266, 271 (Wyo. 2008)). "Errors of this type are so intrinsically harmful as to require automatic reversal without regard to their effect on the outcome." *Id.* (quoting *United States v. Pearson*, 203 F.3d 1243, 1260 (10th Cir. 2000)). We have held "[t]he bar for finding structural error is high." *Id.* at ¶ 21, 327 P.3d at 95.

[¶35] While we have not had the opportunity to address this issue, the Supreme Court of the United States has held the denial of a public trial is structural error. *Id.* at ¶ 21, 327 P.3d at 95 (citing *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)). In *Waller*, the Supreme Court of the United States recognized the right to a public trial was created for the benefit of the accused. *Waller,* 467 U.S. at 46, 104 S. Ct. at 2215 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S. Ct. 2898, 2905, 61 L. Ed. 2d 608 (1979)). When a trial is open to the public, they "may see [a defendant] is fairly dealt with and not unjustly condemned, and [] the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.*

13

(quoting *Gannett*, 443 U.S. at 380, 99 S. Ct. at 2906). An open trial also "encourages witnesses to come forward and discourages perjury." *Id.* (citing *In re Oliver*, 333 U.S. 257, 270 n.24, 68 S. Ct. 499, 506 n.24, 92 L. Ed. 682 (1948)).

[¶36] The right to a public trial is not absolute. *United States v. Allen*, 34 F. 4th 789, 796 (9th Cir. 2022) (citing *United States v. Yazzie*, 743 F.3d 1278, 1286 (9th Cir. 2014)). The Supreme Court of the United States "has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45, 104 S. Ct. at 2215. The *Waller* court noted that such circumstances would be rare, "and the balance of interests must be struck with special care." *Id.* at 45, 104 S. Ct. at 2215.

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* (quoting *Press–Enter. Co. v. Superior Court of Cal.*, 464 U.S. 501, 510, 104 S. Ct. 819, 824, 78 L. Ed. 2d 629 (1984)). *Waller* announced the following test for determining whether a trial may be closed to the public:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48, 104 S. Ct. at 2216.

[¶37] Preventing the spread of Covid-19 is unquestionably a compelling interest. *Roman Cath. Diocese of Brooklyn v. Cuomo*, ____ U.S. _____, 141 S. Ct. 63, 67, 208 L. Ed. 2d. 206 (2020). We must determine whether using the audio broadcast was narrowly tailored and no broader than necessary to protect that interest. *Waller*, 467 U.S. at 48, 104 S. Ct. at 2216. "In considering whether a burden imposed on a constitutional right is narrowly tailored, [courts] consider[], among other things, 'different methods that other jurisdictions have found effective' in addressing the problem 'with less intrusive tools.'" *Allen*, 34 F.4th at 797 (quoting *McCullen v. Coakley*, 573 U.S. 464, 494, 134 S. Ct. 2518, 2539, 189 L. Ed. 2d. 502 (2014)). "The existence of reasonable alternatives also sheds light on whether closure restrictions are narrowly tailored." *Id.* at 798.

14

[¶38]  Mr. Tarpey asks us to follow the approach used by the Ninth Circuit in *Allen* and find providing an audio-only broadcast violated his right to a public trial.  In *Allen*, the federal district court's Covid-19 protocols "precluded members of the public from entering the courtroom[] and gave them access to the proceedings only by streaming audio over the internet." *Allen*, 34 F.4th at 793.  Mr. Allen objected to this protocol asserting it violated his Sixth Amendment right to a public trial, and his counsel advocated for video streaming the trial. *Id.*  The trial court overruled Mr. Allen's objection. *Id.* at 794.  The Ninth Circuit found the district court erred because it did not consider less restrictive alternatives, such as video streaming, and it did not articulate any unique reasons for its more restrictive order. *Id.* at 798–800.  However, the Ninth Circuit did not hold using an audio broadcast always violates a defendant's right to a public trial.  Rather, it stated:

> [W]e emphasize that an order prohibiting the public's visual access to the trial . . . will not always violate the defendant's public trial right.  Certain interests . . . may be so compelling that prohibiting the public's observation of some or all of the proceedings may be warranted. . . .  And where a prohibition on the public's presence at a trial or hearing is no broader than necessary to achieve a compelling interest . . . [an] audio recording may be sufficient to satisfy the public trial right[.]

*Id.* at 800 (internal citations omitted).

[¶39]  In another recent case involving this issue, the Supreme Court of Iowa reversed a defendant's conviction after finding his right to a public trial was violated by the trial court's complete closure of the courtroom to the public, including the defendant's family. *State v. Brimmer*, No. 21-0744, 2022 WL 17835685 (Iowa Dec. 22, 2022).  Mr. Brimmer's trial was originally scheduled for March 31, 2020, but due to the pandemic, his trial was continued multiple times. *Id.* at *1.  In response to the pandemic, the Supreme Court of Iowa "issued guidance on how to safely resume in-person trials while still honoring defendants' constitutional rights, including the right to an open trial." *Id.* at *3.  This guidance required trial courts to maintain six feet of distance between persons in the courtroom, which meant public attendance would be limited. *Id.*  If social distancing resulted in having no room available for the public, trial courts were directed to "set up live feeds of public court proceedings in another room in the courthouse (or, as necessary, streaming online or by videoconference) to permit simultaneous viewing." *Id.* (quoting Iowa Sup. Ct. Supervisory Order, *In the Matter of Resuming In Person Court Services During COVID-19* (July 9, 2020)).

[¶40]  After the trial court seated the venire members, there was still a little room for public spectators. 2022 WL 17835685, at *3.  Mr. Brimmer requested his family and friends be allowed to attend the trial in person, but the trial court denied his request after concluding

15

any public observers would be seated too close to the jurors "for the court's liking." *Id.* at *1. However, the trial court did allow the victim's advocate to sit in the jury box at the state's request. *Id.* at *4. The trial court "explained that the advocate had 'a purpose with this trial' and was not considered part of the public." *Id.* The trial court also dismissed the option of electronically livestreaming the trial because "the judge couldn't navigate the technology by himself." *Id.* at *1, *4. Just before voir dire, defense counsel "again brought up [Mr. Brimmer's] right to a public trial, 'requesting that the public be allowed in' and objecting if it was not." *Id.* at *3. The trial court overruled this objection. *Id.* Ultimately, the courtroom was completely closed to public spectators for the entire trial, and no electronic recording or livestream was made available so the public could watch remotely. *Id.* at *4. The Supreme Court of Iowa found the "complete 'closure was far more extensive than necessary.'" *Id.* at *11 (quoting *Waller*, 467 U.S. at 49, 104 S. Ct. at 2217). It went on to find the trial court had not complied with its obligations under *Waller*. *Id.* at *12–*16. It further found the trial court "had available a reasonable alternative to cutting off all public view of Brimmer's trial, and it violated his right to a public trial when it failed to use that alternative." *Id.* at *16. The Supreme Court of Iowa stated: "No solution to the COVID conundrum was ideal. But simply closing Brimmer's trial to the public violated his constitutional rights, and that structural error entitles him to a new trial." *Id.* at *1.

[¶41] Turning to the case before us, the record reflects the district court was cognizant of its obligations under *Waller*. The district court considered several alternatives to a complete closure, including video streaming the trial on YouTube or through the court's video conference system. However, it found video streaming the trial was not workable because the size of the courtroom made it difficult to place the video equipment in a location where it could capture both the witnesses and the attorneys. The district court specifically stated it "considered the other available options," and it found "the live audiostream [was] the only feasible and practical option. . . . "

[¶42] Unlike *Allen* or *Brimmer*, the district court specifically articulated its reasoning for physically closing the courtroom to the public, it attempted to narrowly tailor the closure, it considered all available alternatives, and it implemented the least restrictive, available option to provide virtual public access to the trial. In addition, at the beginning of the trial, the district court informed the jury Mr. Tarpey was constitutionally entitled to a public trial, explained why the courtroom was not open to members of the public, and notified them the trial was being broadcast so the public and the press could listen to the trial. This announcement showed the district court was attempting to comply with the purposes of a public trial. The public could listen in to ensure Mr. Tarpey was being "fairly dealt with," and the jurors' knowledge that "spectators" were monitoring the trial kept them aware of their responsibility and the importance of their function. *Waller*, 467 U.S. at 46, 104 S. Ct. at 2215 (quoting *Gannett*, 443 U.S. at 380, 99 S. Ct. at 2906). We find the district court complied with *Waller*, and it did not commit structural error when it balanced Mr. Tarpey's right to a public trial against the overriding and compelling interest of preventing the spread of Covid-19 and implemented the least restrictive option for physically closing the

16

courtroom to the public while allowing virtual public access to the trial.

[¶43] In addition, although we have not had a chance to address the issue, other jurisdictions have held a defendant can waive his right to a public trial. *See Singer v. United States,* 380 U.S. 24, 35, 85 S. Ct. 783, 790, 13 L. Ed. 2d 630 (1965) (recognizing a defendant can "under some circumstances" waive his constitutional right to a public trial); *Levine v. United States,* 362 U.S. 610, 619, 80 S. Ct. 1038, 1044, 4 L. Ed. 2d 989 (1960) (holding the exclusion of the public did not violate due process because there was no request to open the courtroom); *United States v. Christi*, 682 F.3d 138, 142–43 (1st Cir. 2012) (holding the defendant waived his public trial argument because defense counsel knew about the closure and failed to object to the closure); *Hutchins v. Garrison*, 724 F.2d 1425, 1431–32 (4th Cir. 1983) (holding the defendant knowingly and intelligently waived his right to a public trial); *Martineau v. Perrin*, 601 F.2d 1196, 1199–1200 (1st Cir. 1979) (holding petitioner and his counsel knowingly and deliberately waived his right to a public trial when they made a conscious decision not to object to the closure); *Commonwealth v. Wall*, 15 N.E.3d 708, 725 (Mass. 2014) (holding "the right to a public trial may be procedurally waived whenever a litigant fails to make a timely objection to an error[,]" and defense counsel could waive a public trial as a "tactical decision without the defendant's express consent"); *State v. Butterfield*, 784 P.2d 153, 155–57 (Utah 1989) (finding defendant waived his right to a public jury trial by failing to object to a closure order).

[¶44] In this case, Mr. Tarpey knew about the district court's plan to partially close the courtroom, and he never objected to that partial closure or to the use of the audio broadcast, even though he had multiple opportunities to do so. The district court's scheduling order put Mr. Tarpey on notice the trial would be subject to Covid-19 protocols, and it set a deadline for Mr. Tarpey to object to those protocols. Mr. Tarpey did not file any objection to those protocols. During a pretrial hearing, the district court informed the parties it would be using the audio broadcast to provide public access, and although defense counsel expressed concerns that this might make it difficult to sequester the witnesses, he did not object to using the audio broadcast. At the end of voir dire, the district court again reminded the parties it intended to provide public access through the audio broadcast, and Mr. Tarpey did not object. Under the facts of this case, we find Mr. Tarpey waived his right to a public trial.

[¶45] Mr. Tarpey also takes issue with the fact that BS and her advocate were allowed to be in the courtroom during closing arguments, while Mr. Tarpey was not allowed to have a family member or friend attend the trial. Defense counsel did not object to BS or the advocate being present for BS's testimony or during closing arguments, and he indicated he believed it would be appropriate to allow BS to be present if she was cautioned not to display any emotions during the closings. Mr. Tarpey's brief does not contain a citation to anywhere in the record where he asked the district court to permit a family member or friend be present for all or a portion of his trial.

[¶46] The Supreme Court of the United States has recognized:

> Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal.

*Levine*, 362 U.S. at 619-20, 80 S. Ct. at 1044. Unlike the defendant in *Brimmer*, Mr. Tarpey never asserted the district court was violating his right to a public trial by not allowing him to have a family member or friend present during all or a portion of the trial. He was repeatedly advised his family members and friends would have to attend the trial remotely, and he never objected to this or any other of the district court's Covid-19 protocols.

[¶47] We "strongly adhere[] to the rule that [we] will not address issues that were not properly raised before the district court." *Harrison v. State*, 2021 WY 40, ¶ 15, 482 P.3d 353, 358 (Wyo. 2021) (quoting *Four B Props., LLC v. Nature Conservancy*, 2020 WY 24, ¶ 69, 458 P.3d 832, 849 (Wyo. 2020)). Even when the newly raised issue presents a constitutional question, "we have held that a new issue may not be considered on appeal even when it is 'of a fundamental nature, because the issue was 'not properly developed for review.'" *Davis v. State*, 2018 WY 40, ¶ 34, 415 P. 3d 666, 678 (Wyo. 2018) (quoting *Crofts v. State ex rel. Dept. of Game and Fish*, 2016 WY 4, ¶ 24, 367 P.3d 619, 625 (Wyo. 2016)). Because Mr. Tarpey never asked to have a family member or friend present, and the district court never had an opportunity to grant or deny this request, this issue was not properly developed for review, and we will not address it.

[¶48] We find the district court did not violate Mr. Tarpey's Sixth Amendment right to a public trial, and he waived his right to a public trial.

## II. Was it plain error to admit the recording of Sergeant Ruschill's phone interview of BS?

[¶49] Mr. Tarpey asserts the district court committed plain error when it allowed BS's recorded interview to be played at the end of her testimony, prior to cross-examination and without any allegation of recent fabrication or improper motive. The State alleges Mr. Tarpey knowingly and affirmatively waived any argument regarding the admissibility of the recorded interview when he stipulated to its admission. We agree with the State.

[¶50] "We reject attempts by a defendant to turn a trial strategy into an appellate error." *Mackley v. State*, 2021 WY 33, ¶ 11, 481 P.3d 639, 642 (Wyo. 2021) (quoting *Toth v. State*, 2015 WY 86A, ¶ 45, 353 P.3d 696, 710 (Wyo. 2015)). "The doctrine of invited error prohibits a party from raising on appeal alleged trial court errors that were induced by that

party's actions." *Id.* (quoting *Jackson v. State*, 2019 WY 81, ¶ 9, 445 P.3d 983, 986 (Wyo. 2019)). "When a party affirmatively waives a right or objection, we do not review it; however, when a party merely forfeits a right or objection, we review for plain error." *Id.* (citing *Jackson*, ¶ 9, 445 P.3d at 987). "Waiver is the 'intentional relinquishment or abandonment of a known right[,]'" while "[f]orfeiture is the failure to make a timely assertion of a right." *Id.* (quoting *Jackson*, ¶ 9, 445 P.3d at 987). "Waiver requires something more affirmative than simple agreement. . . ." *Id.* at ¶ 13, 481 P.3d at 643 (citing *Jackson*, ¶ 9, 445 P.3d at 987).

[¶51] The record shows Mr. Tarpey did more than simply agree to the admission of BS's recorded statement. He stipulated to its admission before trial, and he affirmatively insisted the entire recording be played for the jury. The district court advised Mr. Tarpey that by stipulating to the admission of the recording, he "would be giving up any objections and appeal issues" relating to its admission.

[¶52] At the hearing on the W.R.A.P. 21 motion, trial counsel testified he knew the recording was hearsay, but he made a strategic decision to stipulate to its admission because he believed it supported their theory of defense, and it created credibility issues that could be brought up on cross-examination. Trial counsel did in fact question BS about those issues at trial, and he was able to get BS to admit she lied to law enforcement about her employment status, not knowing Mr. Tarpey or where he worked, and her use of illicit drugs. Admitting the recording also allowed him to argue to the jury that the core details of BS's story changed in each interview. Stipulating to the admission of the recorded statement was an "act of such independent intent" that we must "view it as a complete waiver of the error now alleged on appeal." *Mackley*, 2021 WY 33, ¶ 12, 481 P.3d at 642 (quoting *Vaught v. State*, 2016 WY 7, ¶ 35, 366 P.3d 512, 520 (Wyo. 2016)); *see also Stastny v. State*, 2011 WY 138, ¶ 4, 261 P.3d 747, 748 (Wyo. 2011) (holding abuse of discretion and plain error standards of review are inapplicable "where the appellant has not only failed to object at trial, but has affirmatively acted to introduce or allow introduction of the evidence"). We will not allow Mr. Tarpey to turn this trial strategy into appellate error, and we find Mr. Tarpey waived any appellate argument regarding the admissibility of BS's recorded statement.

### III. Did Mr. Tarpey receive ineffective assistance of counsel?

[¶53] Mr. Tarpey asserts he received ineffective assistance of counsel due to a combination of pretrial and trial deficiencies. He argues "it was not a reasonable tactical decision to stipulate to the admission of BS's recorded interview . . . especially prior to trial." He also asserts trial counsel's performance was deficient in not objecting to the presence of the victim's advocate during BS's testimony and in not objecting to the prosecutor's statement explaining the reason for the advocate's presence. Finally, he claims trial counsel's performance was deficient because he did not understand the Wyoming Rules of Evidence (W.R.E.) pertaining to character evidence. The State

contends "all of the challenged decisions were reasonable tactical decisions that did not fall below the standards for a reasonably competent attorney[,]" and Mr. Tarpey cannot establish he was prejudiced by these alleged errors.

[¶54] To succeed on his claim that he is entitled to a new trial because he was denied his Sixth Amendment right to effective assistance of counsel, Mr. Tarpey "must show <u>both</u> that [his] counsel's performance was deficient, and he was prejudiced as a result." *Buckingham v. State*, 2022 WY 99, ¶ 25, 515 P.3d 615, 619 (Wyo. 2022) (quoting *Steplock v. State*, 2022 WY 12, ¶ 20, 502 P.3d 930, 936 (Wyo. 2022)). "A failure to establish one of the two prongs dooms an ineffective assistance of counsel claim." *Steplock,* ¶ 20, 502 P.3d at 937 (quoting *Neidlinger v. State*, 2021 WY 39, ¶ 53, 482 P.3d 337, 351–52 (Wyo. 2021)). "We may dispose of an ineffective assistance of counsel claim solely on the prejudice prong." *Id.* at ¶ 22, 502 P.3d at 937 (quoting *Jendresen v. State*, 2021 WY 82, ¶ 37, 491 P.3d 273, 285 (Wyo. 2021)). "Appeal of a district court's ruling on a W.R.A.P. 21 motion involves mixed questions of law and fact." *Buckingham*, ¶ 26, 515 P.3d at 619 (citing *Steplock*, ¶ 20, 502 P.3d at 937). "The district court's factual findings are entitled to deference unless they are clearly erroneous, but we review de novo the court's legal conclusions on deficient performance and prejudice." *Id.* (citing *Steplock*, ¶ 20, 502 P.3d at 937).

[¶55] We dispose of Mr. Tarpey's claim under the prejudice prong. To establish prejudice, Mr. Tarpey "must show that absent defense counsel's deficiencies 'there is a reasonable probability the outcome of the trial would have been more favorable to [him.]'" *Steplock*, ¶ 22, 502 P.3d at 937 (citing *Richmond v. State*, 2021 WY 111, ¶ 12, 496 P.3d 777, 781 (Wyo. 2021)). "A claim of prejudice must be supported by more than bald assertions or speculation." *Id.* at ¶ 26, 502 P.3d at 938 (quoting *Jackson*, 2019 WY 81, ¶ 28, 445 P.3d at 991). Mr. Tarpey "must show prejudice under 'circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'" *Klingbeil v. State*, 2021 WY 89, ¶ 43, 492 P.3d 279, 288–89 (Wyo. 2021) (quoting *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015)). When determining if Mr. Tarpey was prejudiced, we review the entire record. *Klingbeil*, ¶ 44, 492 P.3d at 289 (quoting *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634–35 (Wyo. 2017)). "The most important factor in our prejudice analysis is the strength of the State's case." *Shields v. State*, 2020 WY 101, ¶ 40, 468 P.3d 1097, 1108 (Wyo. 2020) (citing *Bogard v. State*, 2019 WY 96, ¶ 72, 449 P.3d 315, 332 (Wyo. 2019)).

### A. Stipulating to the Admission of BS's Recorded Statement

[¶56] Mr. Tarpey asserts he was prejudiced by trial counsel's stipulation to the admission of this evidence because playing the interview bolstered BS's credibility and allowed law enforcement to vouch for her credibility. The State argues Mr. Tarpey was not prejudiced by trial counsel's decision to stipulate to the admission of the recording because it allowed him to attack BS's credibility and argue to the jury that the core details of BS's allegation

20

became more dramatic each time she told her story.

[¶57]   As discussed above, trial counsel made a tactical decision to admit the recording because he thought it helped establish their theory that the sex was consensual.  He felt it was important for the jury to know BS delayed in reporting the incident, and the information she provided to Sergeant Ruschill was incomplete and inaccurate.  He wanted to use the details of her statement to cross-examine her about the inconsistencies in her stories.  Trial counsel also testified he had some concerns about letting BS tell her story twice, but there was an "abundance of evidence" in the case, and he considered all that evidence, including the text messages, when he made the tactical decision to admit the recording.  The district court found trial counsel's stated justifications for stipulating to the admission of the exhibit were "presumptively sound" at the time the decision was made, even though many of the reasons for playing the recording were not realized at the time he cross-examined BS.  The district court concluded Mr. Tarpey failed to show he was prejudiced by trial counsel's tactical decision.

[¶58]   We have said: "[w]hen trial counsel makes a 'strategic decision' in a case, that decision is 'virtually unchallengeable.'" *Neidlinger*, 2021 WY 39, ¶ 56, 482 P.3d at 352 (quoting *Larkins v. State*, 2018 WY 122, ¶ 67, 429 P.3d 28, 44 (Wyo. 2018)).  "The fact that this strategy was ultimately unsuccessful does not require a holding of ineffective assistance of counsel." *Owen v. State*, 902 P.2d 190, 199 (Wyo. 1995), overruled on other grounds by *Sweets v. State*, 2013 WY 98, ¶ 50, 307 P.3d 860, 876 (Wyo. 2013).  In addition, "[a]n unfavorable verdict does not equate to ineffective assistance of counsel." *Larkins*, 2018 WY 122, ¶ 67, 429 P.3d at 44 (citing *Woods v. State*, 2017 WY 111, ¶ 15, 401 P.3d 962, 969 (Wyo. 2017)).

[¶59]   In this case, BS testified in detail about how Mr. Tarpey sexually assaulted her.  During this testimony, she stated Mr. Tarpey struck her twice on the right side of her face, wrapped his hands around her thighs to hold her down, and bit her right ear.  The SANE nurse testified she observed injuries that were consistent with BS's testimony.  The jury saw the string of text messages between BS and Mr. Tarpey, including those where he appears to apologize for what happened.

[¶60]   Because the physical evidence supported BS's version of events, trial counsel needed to challenge BS's credibility.  Playing BS's recorded statement permitted the jury to hear the inconsistencies in the "core details" of her story and allowed trial counsel to elicit BS's admissions about lying to law enforcement.  "[A] 'jury's rejection of the defense strategy does not necessarily demonstrate ineffective assistance of counsel but merely a defense strategy that the jury did not accept.'" *Woods*, 2017 WY 111, ¶ 15, 401 P.3d at 969 (quoting *Barkell v. State*, 2002 WY 153, ¶ 22, 55 P.3d 1239, 1244 (Wyo. 2002)).  Mr. Tarpey failed to establish a reasonable probability he would have enjoyed a more favorable verdict if the recording had not been admitted.  Because Mr. Tarpey failed to establish prejudice, this ineffective assistance of counsel claim fails.

## B. Not Objecting to the Presence of the Advocate

[¶61] Mr. Tarpey asserts there was no strategic reason for trial counsel not to object to the presence of BS's advocate or to the prosecutor's statement about the reason for her presence. He argues the presence of the advocate showed "the jury that BS [was] in fact a victim and ha[d] been so victimized that she [could] not testify without emotional support." He alleges it sent a "powerful, court and State approved message that [BS was] fragile and vulnerable *because [she] had been victimized*." The State asserts trial counsel "exercised reasonable professional judgement [sic]" when he decided not to object to the advocate's presence.

[¶62] At the hearing on the W.R.A.P. 21 motion, trial counsel testified he agreed to let the advocate be present because he thought it was required by the Victim's Bill of Rights. He also stated he knew from personal experience that a victim's advocate is always present in the courtroom during a victim's testimony, and due to the structure of the courtroom during Covid-19, there was no other place for the advocate to sit. He did not object to the announcement regarding the reason for her presence, nor did he request a limiting instruction. In its order denying the W.R.A.P. 21 motion, the district court found: "The Defendant's claim of prejudice on this issue is founded upon nothing more than 'bald assertions or speculation.'" The district court concluded Mr. Tarpey failed to meet his burden of proving there was a reasonable probability he would have enjoyed a more favorable verdict if the advocate had not been present.

[¶63] We agree with the district court. The only evidence Mr. Tarpey offered to support his claim regarding the advocate's presence was the opinion of his expert witness, who opined the presence of the advocate was "hugely prejudicial" to the defense because it sent a clear message that BS was a victim. The expert did not offer any evidence to show it was reasonably probable an objection to the advocate's presence would have been sustained. Given the evidence presented at trial, which the trial court described as substantial and trial counsel described as abundant, we cannot say there is a reasonable probability Mr. Tarpey would have enjoyed a more favorable outcome if the advocate had not been present. Because Mr. Tarpey failed to establish prejudice, this ineffective assistance of counsel claim fails.

## C. Not Calling Character Witnesses

[¶64] Shortly before the trial, Mr. Tarpey sent defense counsel a list of potential character witnesses. Defense counsel informed Mr. Tarpey the Wyoming Rules of Evidence would not allow them to introduce any character evidence unless the State first attacked his reputation for truthfulness. Defense counsel also sent Mr. Tarpey an email in which he discussed portions of W.R.E. 404, while omitting any discussion of W.R.E. 404(a)(1), which allows a defendant to offer evidence of a "pertinent trait" of his character.

22

[¶65] Mr. Tarpey asserts his trial counsel misunderstood the rules pertaining to character evidence, and because of that misunderstanding, defense counsel did not call any character witnesses at trial. He asserts there were "multiple witnesses who would have testified in this case about Mr. Tarpey's pertinent character trait of peacefulness and respect for boundaries in intimate situations," and "there is a reasonabl[e] probability that the outcome of the trial would have been more favorable" if those witnesses had testified. The State asserts "when considering the potential consequences of opening the door to the character evidence, [Mr.] Tarpey cannot show that his attorney's decision was unreasonable[,] nor can he show that presenting character evidence would have changed the trial outcome."

[¶66] At the hearing on the W.R.A.P. 21 motion, trial counsel admitted he did not fully understand the rules pertaining to character evidence, and he did not fully or accurately explain these rules to Mr. Tarpey. However, trial counsel also testified he decided not to call character witnesses because he uncovered some information suggesting Mr. Tarpey had anger and substance abuse issues, which could have come out if he called character witnesses. Trial counsel spoke to Mr. Tarpey's mother, who informed him Mr. Tarpey's girlfriend would testify he changed and became angry when he drank. Mr. Tarpey told trial counsel not to call his girlfriend as a witness, and the girlfriend told trial counsel she did not want to testify. In addition, an investigator for the Sheriff's Office contacted one of Mr. Tarpey's previous coworkers, who told the investigator she thought Mr. Tarpey was abusive, he had been rude to her at work, and he was hotheaded, touchy, and creepy. Another witness, who was a good friend of Mr. Tarpey, told trial counsel "things happen when people drink" and he was on BS's side. Armed with this knowledge, trial counsel decided not to call character witnesses.

[¶67] Mr. Tarpey did not call any of the proposed character witnesses to testify at the hearing on his W.R.A.P. 21 motion, nor did he make an offer of proof as to what those witnesses would have said. The district court found trial counsel "faced legitimate concerns in 'opening the door' on character and credibility issues," and Mr. Tarpey "fell short of proving" trial counsel's decision not to call character witnesses could not be considered sound trial strategy or that he was prejudiced by this decision.

[¶68] When reviewing claims that counsel was ineffective for not calling certain witnesses we have held:

> The decision not to call witnesses is a strategic choice. In order to successfully show ineffective assistance of counsel, the appellant must present the facts about which the proposed witnesses would have testified. The decision whether to call witnesses is normally within the judgment of counsel and will rarely be second-guessed through appellate hindsight.

23

*Richmond*, 2021 WY 111, ¶ 24, 496 P.3d at 783 (quoting *Byerly v. State*, 2019 WY 130, ¶ 92, 455 P.3d 232, 255-56 (Wyo. 2019). Mr. Tarpey failed to present the facts about which of his potential character witnesses would have testified, so he failed to meet his burden of showing he would have enjoyed a more favorable result if these witnesses were called. Because Mr. Tarpey failed to establish prejudice, this ineffective assistance of counsel claim fails.

### D. Not Objecting to the Closure of the Courtroom

[¶69] In his reply brief, Mr. Tarpey argued if we find his right to a public trial was waived by trial counsel, we should find that waiver constituted ineffective assistance of counsel because it resulted in a fundamentally unfair trial. Mr. Tarpey did not raise this issue in his W.R.A.P. 21 motion. Because it was not raised in his W.R.A.P. 21 motion, it was not addressed at the W.R.A.P. 21 hearing. In the affidavit attached to his W.R.A.P. 21 motion, Mr. Tarpey never alleged that he wanted a public trial or that he objected to the closure of the courtroom or the use of the audio broadcast. He also did not aver that he wanted to have family or friends attend the trial. Thus, we do not know if trial counsel made a unilateral decision not to object to the partial closure of the courtroom or if it was a joint decision made by trial counsel and Mr. Tarpey. We also do not know whether trial counsel had a strategic reason for not objecting to the partial closure. Other jurisdictions have recognized that there might be strategic reasons for not objecting to the closure of the courtroom. *See Martineau*, 601 F.2d at 1200; *Hutchins*, 724 F.2d at 1431-32; *Commonwealth v. Lavoie*, 981 N.E.2d 192, 195 (Mass. 2013). Assuming it was trial counsel's decision not to object to the partial closure of the courtroom, Mr. Tarpey has not shown that decision was not an "exercise of reasonable judgment." *Steplock*, 2022 WY 12, ¶ 20, 502 P.3d at 937 (quoting *Neidlinger*, 2021 WY 39, ¶ 53, 482 P.3d at 351–52).

[¶70] Mr. Tarpey's reply brief does not analyze the evidence that was presented at trial, nor does it explain why there would be a reasonable probability that the jury would have viewed this evidence differently if his supporters were present in the courtroom. Because this claim was not supported by more than bald assertions or speculation, Mr. Tarpey failed to meet his burden of showing he was prejudiced by the partial closure of the courtroom. *Steplock*, ¶ 26, 502 P.3d at 938 (quoting *Jackson*, 2019 WY 81, ¶ 28, 445 P.3d at 991). Because Mr. Tarpey failed to establish prejudice, this ineffective assistance of counsel claim fails.

## CONCLUSION

[¶71] The district court complied with its obligations under *Waller* and did not violate Mr. Tarpey's Sixth Amendment right to a public trial when it used an audio broadcast to provide public access to the proceedings. In addition, Mr. Tarpey waived his right to a public trial because he never objected to the partial closure of the courtroom, despite having multiple opportunities to do so. Mr. Tarpey also waived his right to challenge the

24

admission of BS's recorded statement when he stipulated to its admission and affirmatively insisted the entire recording be admitted and played for the jury.  Mr. Tarpey did not meet his burden of demonstrating ineffective assistance of counsel because he failed to prove he was prejudiced by his trial counsel's alleged errors.  Affirmed.