
Filed
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## JUAN FAISAO MENDIOLA,
Defendant-Appellant.

Supreme Court Case No. CRA22-002
Superior Court Case No. CF0245-20

## OPINION

## Cite as: 2023 Guam 12

Appeal from the Superior Court of Guam
Argued and submitted on April 11, 2023
Tamuning, Guam

Appearing for Defendant-Appellant:
Joseph C. Razzano, *Esq.* (briefed)
Joshua D. Walsh, *Esq.* (briefed and argued)
Razzano Walsh & Torres, P.C.
139 Murray Blvd., Ste. 100
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Marianne Woloschuk, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr.
Tamuning, GU 96913


E-Received
11/28/2023 1:14:06 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, C.J.:**

[1]      Defendant-Appellant Juan Faisao Mendiola appeals his conviction of Manslaughter (as a First Degree Felony), as a lesser-included offense to Charge One: Murder (as a First Degree Felony), with a Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony.  On appeal, Mendiola argues: (1) the COVID-19 protocols in the Superior Court deprived him of his right to a public trial; (2) Plaintiff-Appellee People of Guam ("People") violated his due process rights by presenting evidence that impermissibly injected Guam's Castle Doctrine into the proceedings; and (3) the People's use of a *de facto* Castle Doctrine presumption meant Mendiola's claim of self-defense was not disproved beyond a reasonable doubt.  We reject Mendiola's arguments and affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]      Juan Faisao Mendiola was indicted on charges of Murder (as a First Degree Felony), including a Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony, and of Aggravated Assault (as a Second Degree Felony) with a Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony.  The charges stemmed from a shooting at an apartment in Mongmong on a morning in May 2020.

[3]      Before the shooting, Mendiola and Claire Siguenza spent the early hours of the morning, from after midnight until around 5:00 a.m., "hanging out" and talking at a neighbor's apartment. Transcript ("Tr.") at 37-39 (Jury Trial, Aug. 27, 2021).  Eventually Siguenza went to bed, and she testified to telling Mendiola she was too tired to go fishing with him later that morning.  Upon returning to her second-floor apartment, Siguenza found Peter John Tadeo Rios, Jr., inside, waiting

for a friend to pick him up. Before heading to bed, Siguenza told Rios "to not open up the door because [she] wanted to sleep" and to "lock the door" before leaving. *Id.* at 38.

[4]     Mendiola expressed that in the early morning he returned to Siguenza's apartment with fishing equipment. He heard Rios, inside the apartment, acknowledge his presence. But Rios did not call for Siguenza or allow Mendiola into the apartment. Mendiola told police that upon recognizing Rios behind the door, he returned to his vehicle and retrieved a revolver because Rios had a reputation for being a "violent person" and Mendiola was unsure what was happening inside. *Id.* at 103-05. Returning to the apartment with the handgun, Mendiola again tried to enter.

[5]     Soon after Mendiola retrieved the firearm, Rae Ann Quidachay, a friend of Siguenza, Mendiola, and Rios, arrived at the apartment complex. Mendiola continued to knock and asked for Siguenza several times before Quidachay came up the stairs. When she arrived at the apartment, Rios confirmed Quidachay's identity and then opened the door to let her in. When the door opened, Mendiola tried to enter behind Quidachay; however, Rios refused to let him inside.

[6]     Mendiola informed Rios that "he didn't want any trouble" and was only there to take Siguenza fishing. *Id.* at 107-08, 110. With the door open, Mendiola stepped inside far enough to set a fishing pole against the wall. When Mendiola entered and called out for Siguenza, Rios grabbed a knife and "presented it." *Id.* at 108. When Rios produced a knife, Mendiola drew the firearm. He told police that when Rios "lung[ed] at him," he "pointed the weapon at [Rios's] chest and fired a single shot." *Id.* at 110. Mendiola's shot hit Rios in the chest, and Rios "stumbled back against the coffee table and fell to his knees." *Id.* at 110-11. Mendiola then maneuvered around the coffee table to get to Siguenza's bedroom. Rios swung the knife again, and after a failed attempt to take the knife away, Mendiola fired a second shot.

**[7]**     The Guam Police Department ("GPD") and Guam Fire Department ("GFD") responded to Siguenza's apartment, finding Rios on the floor unresponsive, "pulseless" and "breathless." *Id.* at 79-80, 85.  Given Rios's condition, GFD did not attempt to resuscitate but relinquished the scene to GPD for investigation.

**[8]**     Mendiola was arrested following the incident.  Upon receipt and waiver of his *Miranda* rights, Mendiola responded to questions and gave the police a written statement.  He also agreed to participate in a video reenactment.

**[9]**     Mendiola's trial was set for August 2021.  In compliance with Judiciary of Guam COVID-19 protocols, voir dire was conducted in the "Route 4" ancillary courtroom.  Attendance was limited, and no video or audio access for the public was provided.

**[10]**     On the day jury selection began, Mendiola filed a motion *in limine* seeking to prevent the People from offering a Castle Doctrine jury instruction and building a case on the presumption that Rios was justified in using the knife against Mendiola.  The Superior Court granted the motion, concluding, "The People's proposed Castle Doctrine jury instruction cannot be offered, and the People cannot use the Castle Doctrine as a shortcut to prove Defendant did not act in self-defense." Record on Appeal ("RA"), tab 137 at 3 (Dec. & Order, Sept. 23, 2021); Tr. at 65 (Jury Trial, Aug. 30, 2021).

**[11]**     Mendiola's trial was held in the Justice Monessa G. Lujan Appellate Courtroom, located on the third floor of the Guam Judicial Center.  Typically reserved for proceedings before this court, the courtroom was modified so that the gallery was used for a socially-distanced jury box. Remote video-streaming areas were set up in both the first-floor atrium of the Judiciary and in Presiding Judge Lamorena, III's courtroom.  All audio and visuals were broadcast live.

**[12]**     When proceedings began, Mendiola raised concerns about the way the livestream was being carried out. The Superior Court invited Mendiola to file a written motion and called for a recess to ensure the livestream was functioning properly. Mendiola subsequently moved for a new trial, arguing the Superior Court's COVID-19 protocols caused the jury selection and trial to proceed without the public, in violation of the United States Constitution, the Organic Act of Guam, and Guam law. RA, tab 114 (Mot. New Trial, Aug. 30, 2021).[1] In support of this motion, Mendiola filed the declaration of his daughter Mercedes Rosario ("Rosario's Declaration"), which alleged the public could not hear opening statements or the presentation of evidence, the transmission was "muffled," and the screen size for the video stream was inadequate. RA, tab 113 at 1-2 (Decl. Mercedes Rosario, Aug. 30, 2021). Rosario's Declaration also included the assertion that Mendiola's counsel informed her, five days before voir dire, that the public could not attend jury selection because of COVID regulations.

**[13]**     The People opposed this motion, relying on the public health and safety implications of COVID-19 and noting the "impossible position" the Superior Court was in. RA, tab 116 at 2 (People's Opp'n, Aug. 31, 2021). After a hearing on the motion, the Superior Court denied Mendiola's request for a new trial. RA, tab 139 at 1-2 (Dec. & Order, Sept. 28, 2021). It noted the court "addressed these issues by temporarily pausing the trial to make several changes to the broadcast process. The broadcast issues were fully resolved once the trial resumed, and no additional complaints were made to the Court once these changes were made." *Id.* at 4.

**[14]**     Mendiola was found guilty of Manslaughter (as a First Degree Felony), as a lesser included offense to Murder, along with a sentencing enhancement for use of a deadly weapon. He was sentenced to fifteen years of incarceration for Manslaughter and ten years for the Special

---

[1] Mendiola also moved for a judgment of acquittal, arguing the People failed to disprove his assertion of self-defense beyond a reasonable doubt. The motion was denied.

Allegation, with credit for time served, the sentences ordered to run consecutively. Mendiola timely appealed.

## II. JURISDICTION

[15]     This court has jurisdiction to hear appeals from a final judgment of the Superior Court. 48 U.S.C.A. § 1424-1(a)(2) (Westlaw current through Pub. L. 118-21 (2023)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III. STANDARD OF REVIEW

[16]     "When a defendant forfeits his claim by failing to make a timely objection, we must review that claim for plain error." *People v. Camacho*, 2016 Guam 13 ¶ 12 (quoting *United States v. Whitney*, 673 F.3d 965, 970 (9th Cir. 2012)); *see also United States v. Olano*, 507 U.S. 725, 731-33 (1993); *United States v. Santos*, 501 F. App'x 630, 632 (9th Cir. 2012) (unpublished) (applying plain error review to a public trial claim defendant failed to raise during voir dire). "Although we have 'discretion to review plain errors or defects affecting substantial rights, even when not raised at trial,' we exercise this discretion 'sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *People v. Bosi*, 2022 Guam 15 ¶ 46 (quoting *People v. Martin*, 2018 Guam 7 ¶ 11). "We will not reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." *People v. Quitugua*, 2009 Guam 10 ¶ 11; *see also Olano*, 507 U.S. at 732.

[17]     An alleged violation of the Sixth Amendment that has been preserved below is reviewed *de novo*. *See People v. Cruz*, 2016 Guam 15 ¶ 18 (citing *United States v. Yazzie*, 743 F.3d 1278, 1288 (9th Cir. 2014)); *see also United States v. Martinez*, 850 F.3d 1097, 1100 (9th Cir. 2017). Violation of the right to a public trial is a "structural defect affecting the framework within which

the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). These "[s]tructural errors defy harmless error review and are subject to automatic reversal." *People v. Callahan*, 2018 Guam 17 ¶ 32.

[18]    "Evidentiary rulings which infringe on constitutional rights are reviewed *de novo*." *People v. Sablan*, 2023 Guam 4 ¶ 46 (citing *People v. Diego*, 2013 Guam 15 ¶ 8). To declare that admission of evidence violated due process "we must find that the absence of [fundamental] fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)).

[19]    Where the jury is properly instructed on the prosecution's burden to disprove self-defense beyond a reasonable doubt, we review for sufficiency of the evidence. *See People v. Kotto*, 2020 Guam 4 ¶ 30 ("[T]he court must determine whether there is sufficient evidence upon which the jury could find beyond a reasonable doubt that [defendant] lacked justification to use self-defense."); *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). "If a defendant preserves the claim of sufficiency of the evidence by filing a motion for acquittal, the standard of review on appeal is *de novo*." *People v. Maysho*, 2005 Guam 4 ¶ 6. In reviewing a claim for sufficiency of the evidence, this court reviews "the evidence presented at trial in the light most favorable to the People and determine[s] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Pinaula*, 2023 Guam 2 ¶ 60 (alteration in original) (quoting *Kotto*, 2020 Guam 4 ¶ 29). This standard of review is "highly deferential," and the defendant bears the burden of establishing that the evidence was "legally insufficient to sustain a guilty verdict." *Id.* (citations omitted).

## IV.  ANALYSIS

### A.  The Superior Court's COVID-19 Protocols

[20]　　Mendiola argues the Superior Court's COVID-19 protocols deprived him of a public trial, in violation of the United States Constitution and the Organic Act of Guam.  He contends this was a structural error, requiring a new trial.

[21]　　The Sixth Amendment to the United States Constitution, incorporated by the Organic Act of Guam, guarantees the accused the "right to a speedy and public trial."  U.S. Const. amend. VI.; 48 U.S.C.A. § 1421b(g); *see also* 8 GCA § 1.11(a) (2005).  This requirement of a public trial is for the benefit of the accused.  *Waller v. Georgia*, 467 U.S. 39, 46 (1984).  A public trial ensures the interests of the accused are protected as "the public may see [the defendant] is fairly dealt with and not unjustly condemned, and . . . the presence of interested spectators may keep [the] triers keenly alive to a sense of their responsibility and to the importance of their functions."  *Id.* (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)).

[22]　　The Sixth Amendment right to a public trial adheres to more than the trial itself, *id.* at 45; the guarantee of open and public proceedings also covers the voir dire examination of potential jurors, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam).  And although the right to a public trial is protected by the First[2] and Sixth Amendments, like other constitutional rights, "a defendant's right to a public trial is not absolute."  *United States v. Allen*, 34 F.4th 789, 796 (9th Cir. 2022) (citing *Yazzie*, 743 F.3d at 1286).  The United States Supreme Court has clarified that the right to a public trial may "give way in certain cases to other rights or interests."  *Waller*, 467 U.S. at 45.  These circumstances are rare, and a balance of interests must be carefully reached.  *Id.*

---

[2] The Supreme Court has held the right of the press and the public to attend criminal trials is also implicit in the First Amendment. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980).  This court has yet to address a defendant's Sixth Amendment right to a public trial, but we have addressed the public's right of access to criminal proceedings in the First Amendment context. *Guam Publ'ns, Inc. v. Superior Court*, 1996 Guam 6 ¶ 13.

**[23]**     In *Waller v. Georgia*, 467 U.S. 39 (1984), the U.S. Supreme Court laid out the analytical framework for determining whether a defendant's Sixth Amendment right to a public trial has been violated. In that case, over the objections of several co-defendants, the trial court closed the courtroom to "all persons other than witnesses, court personnel, the parties, and the lawyers." *Id.* at 42. The *Waller* Court held that:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 45 (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984)).

**[24]**     Since *Waller*, many lower courts have sought to narrow the class of cases subject to its strict requirements. *See, e.g.*, *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) ("In applying *Waller* to the instant case, we note a significant difference. *Waller* dealt with the *total closure* of a suppression hearing in which *all* persons other than witnesses, court personnel, the parties and their lawyers were excluded for the duration of the hearing. The case herein, however, deals with a *partial closure* of a trial in which only members of the defendant's family were excluded and then only for the duration of one witness' testimony."); *see also* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.1(b) (4th ed. Westlaw through 2022). Where restrictions on courtroom access are only partial or temporary, some courts have held that there was no "closure" at all, *see, e.g.*, *United States v. Lnu*, 575 F.3d 298, 306 (3d Cir. 2009), or that the improper exclusion was too trivial to implicate the Sixth Amendment, *see, e.g.*, *United States v. Anderson*, 881 F.3d 568, 576 (7th Cir. 2018) ("[T]rivial violations do not run awry of the Sixth Amendment . . . ."). However, a majority of federal circuits have relied on the facts of *Waller* to differentiate between

closures of the courtroom that are "total" or "complete" and those that are "partial."[3] *See United States v. DeLuca*, 137 F.3d 24, 33 (1st Cir. 1998) (collecting cases). Under this distinction, a partial closure occurs when the court has excluded only some people from the courtroom, "either for the duration of the proceeding or for a limited period of time." *Allen*, 34 F.4th at 797 (citing *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989)).

[25]    "All federal courts of appeals that have distinguished between partial closures and total closures modify the *Waller* test so that the 'overriding interest' requirement is replaced by requiring a showing of a 'substantial reason' for a partial closure, but the other three factors remain the same." *United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015); *see also State v. Turrietta*, 2013-NMSC-036, ¶ 18, 308 P.3d 964 ("This 'substantial reason' standard appears to originate from a lack of case law addressing *Waller* in the context of partial closures and from the *Press–Enterprise* court alluding to a distinction between constitutional requirements for total and partial closures."). As both partial and total closures burden a defendant's constitutional rights, a defendant who objects to the closure has a right to be heard before either is undertaken.[4] *See Sherlock*, 962 F.2d at 1358; *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001); *cf. Guam Publ'ns, Inc. v. Superior Court*, 1996 Guam 6 ¶ 16 ("[T]hose excluded from the proceeding must be afforded a reasonable opportunity to state their objections . . . .").

---

[3] In the Sixth Amendment context, "[t]he Supreme Court has never differentiated between, nor used the terms, partial and complete closures." Stephen E. Smith, *The Right to a Public Trial in the Time of COVID-19*, 77 Wash. & Lee L. Rev. Online 1, 7 (2020). *But see Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 512 (1984) (discussing "limited closure"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 622 (1982) (Stevens, J., dissenting) ("[T]he press, the prosecutor, and defense counsel would have argued the constitutionality of the partial-closure order . . . .").

[4] Mendiola raised concerns surrounding the livestream and lack of a public trial at the start of trial on August 27, which were addressed by the Superior Court. He then moved for a new trial based on this issue, and the trial court held a hearing on the motion. Thus, he was given a reasonable opportunity to be heard at a meaningful time and in a meaningful manner.

### 1. Mendiola failed to timely object to the closure of jury selection, subjecting this claim to plain error review.

[26]    A defendant may forfeit the right to a public trial "either by affirmatively waiving it or by failing to assert it in a timely fashion." *United States v. Rivera*, 682 F.3d 1223, 1232 (9th Cir. 2012); *see also Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017) (holding that proper remedy for addressing violation of right to public trial depends on when objection was raised). Unlike waiver, however, mere forfeiture does not extinguish a legal error. *Olano*, 507 U.S. at 733-34; *Quitugua*, 2009 Guam 10 ¶ 14. A defendant's constitutional right to a public jury selection may be forfeited when no objection is made at the time of the courtroom's closure to members of the public, but that error may still be reviewed under a plain error analysis. *See People v. Vaughn*, 821 N.W.2d 288, 308 (Mich. 2012) ("While a criminal defendant has the constitutional right to a public trial, that right is forfeited when no objection is made at the time of the courtroom's closure to members of the public. As a forfeited claim of constitutional error, it can be redressed if the defendant shows that the court's exclusion of members of the public during voir dire was 'a plain error . . . .'"); *People v. Radford*, 2020 IL 123975, ¶ 37 ("A contemporaneous objection is particularly crucial when challenging any courtroom closure."); *State v. Pinno*, 2014 WI 74, ¶ 63, 356 Wis. 2d 106, 850 N.W.2d 207 ("[T]he Sixth Amendment right to a public trial may be forfeited when a defendant knows that the judge has ordered the public to leave the courtroom but does not object."); *see also People v. Chong*, 2019 Guam 30 ¶ 9 ("[A] waiver precludes appellate review, while a forfeiture is subject to plain error review.").

[27]    Mendiola did not object to the closure of voir dire until after the jury had been empaneled and the trial began. *See* RA, tab 114 (Mot. New Trial) (showing Mendiola orally expressed concerns about livestream on second day of trial but did not object to closure of voir dire until after third day of trial in his motion). There is evidence that Mendiola knew the public would be

excluded before jury selection began. *See* RA, tab 113 at 1 (Decl. Mercedes Rosario) (averring that Mendiola's counsel informed Ms. Rosario five days before voir dire began that she could not attend jury selection because of COVID-19 regulations); *cf. United States v. Gupta*, 699 F.3d 682, 689-90 (2d Cir. 2012) (declining to find forfeiture of Sixth Amendment challenge because parties agreed that trial counsel was unaware of closure at time it occurred).

[28]     Furthermore, Mendiola explicitly accepted the empanelment of the jury. Tr. at 135 (Jury Selection, Aug. 25, 2021). Based on these facts, Mendiola was untimely in his objection to the closure of voir dire. Because he forfeited his right to a public jury selection, we review the closure of voir dire for plain error and will reverse only if "(1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." *Quitugua*, 2009 Guam 10 ¶ 11; *see also State v. Bond*, 170 Ohio St. 3d 316, 2022-Ohio-4150, 212 N.E.3d 880, at ¶ 16 ("Thus, neither *Waller* nor this court's precedent recognizing that a public-trial violation is structural error answer the question whether a public-trial violation is a *correctible* error when the defendant did not object to the closure at trial. To answer that question, we apply a plain-error analysis.").

### a. The closure of jury selection was error, clear or obvious under current law, thus satisfying the first two prongs of plain error review.

[29]     It is undisputed that the public was not present during voir dire. Mendiola stresses, "No members of the public—including members of the Defendant's and alleged victim's families—were allowed to attend, and the record provides no showing that an effort was made to provide video or audio remote access for the public in a courtroom closed to the public." Appellant's Br. at 4-5 (June 15, 2022). The People agree the public was absent but maintain the trial court had to "protect the overriding interests of public health and safety, while complying with the

administrative and executive orders, by limiting who could attend jury selection." Appellee's Br. at 25 (Aug. 12, 2022).

[30]     Neither party disagrees that *Waller* should apply to this closure of voir dire because "*all persons other than witnesses, court personnel, the parties and their lawyers* [were] excluded." *See Allen*, 34 F.4th at 797 (quoting *Rivera*, 682 F.3d at 1236); *see also Presley*, 558 U.S. at 213 (stating it is "well settled that the Sixth Amendment right extends to jury *voir dire*" and that "*Waller* provided standards for courts to apply before excluding the public from any stage of a criminal trial"). A closure may be justified only if the *Waller* factors are satisfied: (1) the proponent of court closure advances an overriding interest likely to be prejudiced, (2) the closure is no broader than necessary to protect that interest, (3) the court considers reasonable alternatives to closing the proceeding, and (4) the court makes findings adequate to support the closure. *English v. Artuz*, 164 F.3d 105, 108 (2d Cir. 1998) (citing *Waller*, 467 U.S. at 48). "These requirements are not dispensed with when the court itself initiates the closure. The court must consult with the parties, one of whom has a constitutional right to a public trial." *Pinno*, 2014 WI 74, ¶ 73. The court now turns to applying the *Waller* factors to the closing of voir dire.

### i. Limiting the transmission of COVID-19 was an overriding interest.

[31]     "[P]rotecting the public from unnecessarily spreading a potentially fatal virus is not only a purpose the government *may* pursue; it is one it has an obligation to." *United States v. Babichenko*, 508 F. Supp. 3d 774, 779 (D. Idaho 2020) (quoting Stephen E. Smith, *The Right to a Public Trial in the Time of COVID-19*, 77 Wash. & Lee L. Rev. Online 1, 6 (2020)). The Ninth Circuit has held that "the goal of limiting the transmission of COVID while holding a trial [is] an overriding interest." *Allen*, 34 F.4th at 797; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct.

63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . .").

[32]     At the time of Mendiola's trial, COVID-19 had disrupted daily life, with there being almost 10,000 positive cases and nearly 150 deaths in Guam. *See Joint Information Center (JIC) Release No. 765*, Guam Homeland Security Office of Civil Defense (Aug. 25, 2021, 8:30 PM), https://www.ghs.guam.gov/jic-release-no-765-covid-19-hospital-census-32-147-1456-test-positive-covid-19-fifteen-gdoe-students.  We agree with the Superior Court that "[t]he ongoing Covid-19 pandemic and surge of infections in Guam clearly present[ed] an overriding interest to close the courtroom to In-person viewing from the public."  RA, tab 139 at 3 (Dec. & Order). Given these circumstances, this factor was met.

### ii. The closure was broader than necessary.

[33]     Trial courts must take all reasonable measures to accommodate public attendance at criminal trials. *Presley*, 558 U.S. at 215.  The court is also responsible for the safety of everyone in the courtroom. *United States v. James*, No. CR-19-08019-001-PCT-DLR, 2020 WL 6081501, at *1 (D. Ariz. Oct. 15, 2020).  "A courtroom closure is narrowly tailored to a[n] . . . overriding interest if it is 'no broader than necessary to protect that interest.'" *Allen*, 34 F.4th at 797 (quoting *Waller*, 467 U.S. at 48).  When determining whether the closure was narrowly tailored, a court should consider, among other things, "'different methods that other jurisdictions have found effective' in addressing the problem 'with less intrusive tools.'" *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)).

[34]     During the height of the pandemic, this court promulgated administrative orders establishing directives and protocols throughout the Judiciary, including "temporarily suspending certain court operations, imposing social distancing and mask mandates, and expanding the use of

technologies to limit in-person hearings." *Seventeenth Updated Order Relative to Court Operations Under Exigent Circumstances Related to COVID-19 (Coronavirus)*, ADM21-657 at 1 (July 30, 2021). Administrative Order No. 21-657 was in effect at the time of Mendiola's trial and provides: "Subject to the discretion of the judicial officer, courts may continue to limit in-person contact when feasible by using available technologies, including alternative means of filing, teleconferencing, video conferencing (e.g., Zoom), and use of email, except when doing so would contravene the protection of constitutional rights." *Id.* at 2. Administrative Order No. 21-657 also directed:

> Court proceedings shall be open to the public except where public access is typically restricted (e.g., juvenile proceedings and other sealed matters). To the extent logistically possible, when hearing a matter through video conference or other remote means, the court shall provide public access by video or audio if the proceeding is typically open to the public.

*Id.* at 4.

[35]     The day of jury selection, Administrative Order No. 21-719 was disseminated, requiring individuals entering a Judiciary facility to maintain a physical distance of at least six feet from other individuals. *Eighteenth Updated Order Relative to Court Operations Under Exigent Circumstances Related to COVID-19 (Coronavirus)*, ADM21-719 at 2 (Aug. 25, 2021).

[36]     The pandemic posed unique challenges to jurisdictions across the United States. There is limited authority on the subject, though a few courts have considered the closure of voir dire because of COVID-19. In *Lappin v. State*, the Indiana Court of Appeals examined whether a trial court violated a defendant's right to a public trial when it limited the public's attendance to audio-only during voir dire to comply with COVID-19 related administrative orders that required social distancing. 171 N.E.3d 702, 703, 706-07 (Ind. Ct. App. 2021). The court held the closure was narrowly tailored because even though "the trial court was faced with a global health pandemic,"

it "did not take the drastic measure of closing the courtroom. Instead, the trial court followed the supreme court's order and provided a live stream of the venire selection." *Id.* at 707. The Court of Appeals concluded that "[i]n all, . . . the trial court implemented reasonable accommodations to deal with a nearly unprecedented global pandemic during the voir dire selection." *Id.*

[37]     Here, unlike in *Lappin*, nothing in the record suggests the Superior Court offered any audio or visual access to Mendiola's jury selection. Because jury selection is a court proceeding typically open to the public, under Administrative Order No. 21-657, at a minimum, the Superior Court had a responsibility to provide some type of access to the public. Although there were technological complications throughout jury selection, with voir dire taking place in the "Route 4" ancillary courtroom to comply with social distancing requirements, and with frequent audio and visual troubles, *see* Tr. at 5-7, 32, 59, 71, 75, 108, 123, 126, 130 (Jury Selection, Aug. 25, 2021), the problem posed by COVID-19 could have been addressed "with less intrusive tools" than completely excluding the public from viewing, or listening to, the jury selection process, *see Allen*, 34 F.4th at 797. While we acknowledge the trial court faced a nearly unprecedented global pandemic during the voir dire selection, it failed to implement any reasonable accommodations to deal with that challenge. *See Lappin*, 171 N.E.3d at 707.

[38]     Preventing the public from accessing the voir dire process was not narrowly tailored to the public health crisis at hand. This was error.

### iii. The Superior Court failed to consider reasonable alternatives.

[39]     "The existence of reasonable alternatives also sheds light on whether closure restrictions are narrowly tailored." *Allen*, 34 F.4th at 798. "[T]hat trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear . . . ." *Presley*, 558 U.S. at 214. Our conclusion that the trial court erred in ultimately excluding the public from jury

selection is further supported by the fact that nowhere in the record did the Superior Court consider reasonable alternatives to the closure.

[40]     During the height of the pandemic, jurisdictions across the United States adopted a range of measures to minimize health risks. These measures included requiring social distancing, face coverings, and sanitation protocols, all of which affected the methods for conducting proceedings and accessing the judiciary.[5] Although the Supreme Court of Guam promulgated administrative orders, and the Judiciary of Guam adopted directives and protocols regarding COVID, "it was still incumbent upon [the trial court] to consider all reasonable alternatives to closure." *Presley*, 558 U.S. at 216. "There are no doubt circumstances where a judge could conclude [particular interests] are concrete enough to warrant closing *voir dire*," but even in those cases the court must first consider alternatives that would continue to provide some type of public access.[6] *Id.* at 215-16.

[41]     The Superior Court erred because it did not narrowly tailor the closure of jury selection or consider reasonable alternatives such as providing video or audio access.[7] This error was clear

---

[5] *See Constitutional Concerns Related to Jury Trials During the COVID-19 Pandemic*, National Center for State Courts (Mar. 29, 2021), https://www.ncsc.org/__data/assets/pdf_file/0034/57886/Constitutional-Concerns-Related-to-Jury-Trials-During-the-COVID-19-Pandemic.pdf; *Court Operations and Pandemic Response – Annual Report 2021*, U.S. Courts, https://www.uscourts.gov/statistics-reports/court-operations-and-pandemic-response-annual-report-2021 (last visited Oct. 5, 2023) (observing that courts had to ease and tighten restrictions on courthouse procedures based on improvement or deterioration in local public health conditions).

[6] To comply with the clear mandate stated in *Presley v. Georgia*, 558 U.S. 209 (2010), the Superior Court could have looked to other jurisdictions for alternatives that would continue to provide public access to voir dire. *See Lappin v. State*, 171 N.E.3d 702, 707 (Ind. Ct. App. 2021); *United States v. Huling*, 542 F. Supp. 3d 144, 147 (D.R.I. 2021) (reserving separate viewing room in courthouse for public and press to watch closed-circuit, live video and audio feed of voir dire to ensure public access to proceeding); *People v. Lowe*, No. F081621, 2022 WL 11715022, at *5-6 (Cal. Ct. App. Oct. 20, 2022) (livestreaming proceedings on YouTube).

[7] We need not reach whether the trial court erred in failing to make *Waller* findings. Although it is better practice for the court to make findings explicitly on the record, *State v. McClendon*, No. A21-0513, 2022 WL 996549, at *7 (Minn. Ct. App. Apr. 4, 2022), this case highlights why a contemporaneous objection is particularly crucial when challenging the closure of jury selection, *People v. Radford*, 2020 IL 123975, ¶ 37. "[W]hen a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed. When a defendant [fails to object], however, the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure." *Weaver v. Massachusetts*, 582 U.S. 286, 302 (2017).

under existing law. *See Presley*, 558 U.S. at 213-14; *Weaver*, 582 U.S. at 292 ("*Presley* made it clear that the public-trial right extends to jury selection . . . .").

**b. The erroneous deprivation of the right to a public trial is a structural error, though we need not reach whether this automatically satisfies the third prong of plain error review.**

[42] "Even though an error is clear or obvious under current law, it must also 'affect[] substantial rights' in order to warrant notice on appeal." *People v. Felder*, 2012 Guam 8 ¶ 22 (alteration in original) (quoting *Quitugua*, 2009 Guam 10 ¶ 11). Certain preserved errors, including the denial of a public trial, are structural errors subject to automatic reversal. *Callahan*, 2018 Guam 17 ¶ 32. But preserved and unpreserved structural errors are distinguishable concepts. *United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020); *cf. Weaver*, 582 U.S. at 302 (observing the "difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim"). When no proper objection is made to a courtroom closure, review is for plain error. *See Williams*, 974 F.3d at 340-41.

[43] The United States Supreme Court has specifically reserved judgment on whether an unpreserved structural error automatically affects a defendant's substantial rights. *Puckett v. United States*, 556 U.S. 129, 140 (2009) ("This Court has several times declined to resolve whether 'structural' errors—those that affect 'the framework within which the trial proceeds,'—automatically satisfy the third prong of the plain-error test." (quoting *Fulminante*, 499 U.S. at 310) (citing cases)); *see also Vaughn*, 821 N.W.2d at 303-04. While we have recognized that structural errors are "so intrinsically harmful that automatic reversal is required without regard to their effect on the outcome," *People v. Quintanilla*, 2001 Guam 12 ¶ 23 (citing *Neder v. United States*, 527 U.S. 1, 7 (1999)), we have never squarely held that a structural error automatically affects a

defendant's substantial rights for purposes of the third prong of plain error review. Our few cases discussing structural error suggest that such an error would satisfy the third prong of plain error review but stop short of so holding because the errors in those cases were not structural. *See, e.g.*, *People v. Libby*, 2021 Guam 27 ¶ 55; *People v. Taisacan*, 2018 Guam 23 ¶ 37; *Quitugua*, 2009 Guam 10 ¶ 36; *People v. Perry*, 2009 Guam 4 ¶¶ 35-40. And on the rare occasion where we have found a structural error, the error was preserved in the trial court and subject to harmless error review. *See Callahan*, 2018 Guam 17 ¶ 33 (finding automatic reversal was required where defendant, over his objection, was excluded from trial and separated from his attorney during testimony of key witnesses).

[44]     We need not decide today whether a structural error automatically affects a defendant's substantial rights for purposes of plain error review. Even assuming it does, the fourth prong of plain error analysis must still be met. As discussed below, we determine that reversal is not necessary under the fourth prong of plain error review.

### c. Failure to correct the error would not result in a miscarriage of justice or threaten the integrity of the judicial process.

[45]     "Reversal for plain error is not mandatory." *People v. Aldan*, 2018 Guam 19 ¶ 31. Even if we determine that the error affected Mendiola's substantial rights, "our inquiry would not be complete. The final consideration in the plain-error analysis is whether correcting the error is required to prevent a manifest miscarriage of justice or whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Bond*, 170 Ohio St. 3d 316, 2022-Ohio-4150, 212 N.E.3d 880, at ¶ 35 (citing *Olano*, 507 U.S. at 736;); *see also Felder*, 2012 Guam 8 ¶ 37 (quoting *People v. Carines*, 597 N.W.2d 130, 138 (Mich. 1999)); *Quitugua*, 2009 Guam 10 ¶ 46 ("The plain error doctrine, as it has developed in Guam, allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances—only 'where necessary to prevent

a miscarriage of justice or to maintain the integrity of the judicial process.'" (quoting *People v. Demapan*, 2004 Guam 24 ¶ 5)); *Vaughn*, 821 N.W.2d at 304 (citing *Carines*, 597 N.W.2d at 138). We are afforded great discretion in making this determination. *Felder*, 2012 Guam 8 ¶ 37.

[46] Although denial of the right to a public trial is a structural error, it is still subject to the requirement that plain error reversal should be employed only to correct a miscarriage of justice or maintain the integrity of the judicial process. The Ohio Supreme Court, in a recent opinion, aptly noted:

> "[T]he [United States Supreme] Court has not said that a public-trial violation renders a trial fundamentally unfair in every case." As the *Weaver* court pointed out, "while the public-trial right is important for fundamental reasons, in some cases an *unlawful* closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." If a trial was fundamentally fair *in spite of* a public-trial violation, it would be odd to conclude that the error must be corrected when no objection was made.

*Bond*, 170 Ohio St. 3d 316, 2022-Ohio-4150, 212 N.E.3d 880, at ¶ 36 (alterations in original) (quoting *Weaver*, 582 U.S. at 298-99); *see also Vaughn*, 821 N.W.2d at 304; *Williams*, 974 F.3d at 342 ("[E]ven when confronting a structural error, a federal court of appeals should evaluate the error in the context of the unique circumstances of the proceeding as a whole to determine whether the error warrants remedial action."); *Aldan*, 2018 Guam 19 ¶ 31. "While 'any error that is "structural" is likely to have *an* effect on the fairness, integrity or public reputation of judicial proceedings,' the plain-error analysis requires us to 'consider whether an error "*seriously*" affected those factors.'" *Vaughn*, 821 N.W.2d at 304; *cf. Felder*, 2012 Guam 8 ¶¶ 26, 37.

[47] As the Second Circuit has recognized, "it does not follow that every temporary instance of unjustified exclusion of the public—no matter how brief or trivial, and no matter how inconsequential the proceedings that occurred during an unjustified closure—would require that a conviction be overturned." *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009). This analysis

"does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer 'prejudice' or 'specific injury,'" but it instead examines "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." *Vaughn*, 821 N.W.2d at 304 (quoting *United States v. Gupta*, 650 F.3d 863, 867 (2d Cir. 2011), *vacated and superseded on other grounds by* 699 F.3d 682 (2d Cir. 2012)).

[48]    The U.S. Supreme Court has described the goals sought by these protections to include "(1) ensuring a fair trial, (2) reminding the prosecution and court of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and (4) discouraging perjury." *Vaughn*, 821 N.W.2d at 304; *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller*, 467 U.S. at 46-47). The third and fourth protected values were not implicated in this case by the closure of jury selection because no witnesses testified at voir dire. *See Vaughn*, 821 N.W.2d at 304. We therefore analyze whether the closure of jury selection subverted the remaining two values protected by the Sixth Amendment. *See id.* at 304-05.

[49]    A review of Mendiola's jury selection shows that "both parties engaged in a vigorous voir dire process, that there were no objections to either party's peremptory challenges of potential jurors, and that each party expressed satisfaction with the ultimate jury chosen." *See id.* at 305. We find the analysis of the Michigan Supreme Court to be highly persuasive on this issue:

> [B]ecause "the *venire* is drawn from the public itself," individual veniremembers "remain public witnesses during much of the *voir dire* proceedings, listening to the court's questions and observing the conduct of counsel, until such time as they are chosen for the jury, disqualified, or excused." Thus, "the presence of the *venire* lessens the extent to which [the court's] closure implicates the defendant's public trial right because the *venire*, derived from and representative of the public, guarantees that the *voir dire* proceedings will be subject to a substantial degree of continued public review."

*Id.* (second alteration in original) (footnotes omitted). Given the presence of the venire in this case, we cannot say that a fair trial was subverted by the closure of the "Route 4" ancillary courtroom; nor can we say that the closure resulted in a failure to remind the People and the Superior Court of their responsibility to the accused and the importance of their functions.

[50]   During oral argument, Mendiola contended public confidence in voir dire was infringed on when members of the public were gathered and placed behind a cyclone fence, unable to hear instructions from the judge. Oral Arg. at 9:40:29-9:42:23 (Apr. 11, 2023). We find this argument meritless. The record shows that during jury selection, questions and responses were repeated whenever there was an issue with acoustics, and the Superior Court ensured court staff watched jurors closely. Tr. at 5-7, 10, 71 (Jury Selection, Aug. 25, 2021). Further, given the novelty of the virus at the time of Mendiola's trial, using partitions between jurors as a method of responding to the need to protect public health and safety was reasonable.

[51]   As the closure of the courtroom was limited to a vigorous voir dire process that ultimately yielded a jury that satisfied both parties, we cannot conclude that the closure "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *See Vaughn*, 821 N.W.2d at 305 (quoting *Carines*, 597 N.W.2d at 138); *Bond*, 170 Ohio St. 3d 316, 2022-Ohio-4150, 212 N.E.3d 880, at ¶ 37. Mendiola is not entitled to a new trial based on his forfeited claim of error with regard to jury selection.

### 2. Mendiola timely objected to the closure of trial; therefore, we review this claim *de novo*.

[52]   Mendiola also argues the procedures the Superior Court implemented during trial amounted to a complete closure of the court because the public could not access "significant portions" of the trial. Appellant's Reply Br. at 4 (Sept. 28, 2022). Because he preserved this claim below, we review this challenge *de novo*. *See Cruz*, 2016 Guam 15 ¶ 18. Nearly every jurisdiction

faces the question of whether the Sixth Amendment was violated by COVID-19 protocols that modified public access to and attendance at criminal trials. *See* Stephen E. Smith, *United States v. Allen and Judicial Review of Early Pandemic Courtroom Closures*, 99 Denv. L. Rev. Forum 1 (2022) ("Trial court judges in 2020 were faced with a remarkable new problem. They were asked to accommodate both public health concerns . . . and criminal defendants' Sixth Amendment right to a public trial. As courts of appeal begin their review of cases alleging violations of the Sixth Amendment's right to a public trial arising during the early pandemic, they should be careful to consider conditions as they were at the time."). Yet, there is little history to "draw on of courtroom closures implemented for public health reasons." *Id.* (citing *Colletti v. State*, 12 Ohio App. 104, 122 (Ct. App. 1919) (concluding closure during "Spanish Flu" pandemic was within judge's "police power"); *United Press Ass'ns v. Valente*, 120 N.Y.S.2d 174, 182 (App. Div. 1953) (listing as a justification for closure the "danger of epidemic through the spreading of Spanish influenza")). Although there is limited persuasive authority on this issue, various appellate courts have recently ruled on the constitutionality of the COVID-19 protocols in trial courts.

[53]    In *People v. Zemek*, a defendant argued her right to a public trial was violated when the trial court's livestream experienced technical difficulties, with malfunctions lasting for several hours. 310 Cal. Rptr. 3d 812, 830-31 (Ct. App. 2023). The California Court of Appeals rejected this challenge, noting:

> Additionally, to the extent that Zemek is arguing that her right to a public trial was violated the few times the livestream malfunctioned, we are not persuaded. Zemek's trial was a lengthy, seven-week trial. It appears that the livestream did not work a few times, for hours at a time. That said, the fact that the public could not follow the testimony of a few witnesses does not otherwise erode the trial court's efforts to maintain the public nature of the trial. Indeed, when notified of a problem with livestream, the trial court asked for assistance and was mindful of the issue. When it appeared that the livestream would take a while to fix, the trial court arranged to move to another courtroom where livestream was working. There is no

indication in the record that the trial court ignored other technology that was available to the Riverside Superior Court to stream the trial.

*Id.* at 832.

[54]     In *Tarpey v. State*, the Wyoming Supreme Court considered a Sixth Amendment challenge after the trial court selectively closed the courtroom to everyone except the victim and her advocate and provided a live audio stream for the public. 2023 WY 14, ¶¶ 8, 9, 33, 523 P.3d 916, 922-23, 927 (Wyo. 2023). The court rejected the defendant's argument, concluding the record reflected the district court was "cognizant of its obligations under *Waller*," considering several alternatives to a complete closure and implementing "the least restrictive, available option to provide virtual public access to the trial." *Id.* ¶¶ 41-42. The Wyoming Supreme Court found "[t]he public could listen in to ensure [the defendant] was being 'fairly dealt with,' and the jurors' knowledge that 'spectators' were monitoring the trial kept them aware of their responsibility and the importance of their function." *Id.* ¶ 42 (quoting *Waller*, 467 U.S. at 46). The district court complied with *Waller* and did not violate the Sixth Amendment when it "implemented the least restrictive option for physically closing the courtroom to the public while allowing virtual public access to the trial." *Id.*

[55]     Finally, in *United States v. Ansari*, the Fifth Circuit determined the Sixth Amendment was not violated when the trial court made an "eminently reasonable" effort to balance the right to a prompt public trial with the need to conduct the trial in line with COVID-19 guidelines. 48 F.4th 393, 402 (5th Cir. 2022). The Fifth Circuit concluded that "[b]ecause the Sixth Amendment does not require a district court to render a particularized dissertation to justify a partial courtroom closure that is reasonable, neutral, and largely trivial (i.e., requiring spectators to watch and listen on livestream rather than in-person)," the district court's decision to restrict the public to an

overflow room featuring a contemporaneous audio and video stream of the trial was not unconstitutional. *Id.* at 403.

[56]     Here, the Superior Court set up video streaming in the courthouse during Mendiola's trial. Members of the public were not allowed in the courtroom, but remote video-streaming areas were assembled in both the first-floor atrium of the Judicial Center and in Presiding Judge Lamorena, III's trial courtroom. All audio and video were broadcast live. Although it appears these protocols were a "partial closure" of the courtroom and that applying the less stringent "substantial reason" requirement would be appropriate in this case, we need not reach this question today because we believe the Superior Court's closure satisfies the original *Waller* factors. *See United States v. Barronette*, 46 F.4th 177, 193 (4th Cir.), *cert. denied*, 143 S. Ct. 414 (2022). As discussed above, limiting the spread of COVID-19 was an overriding interest, so we limit our analysis to the remaining *Waller* factors.

### a. The Superior Court's use of a livestream was narrowly tailored.

[57]     In line with other jurisdictions, the Superior Court's use of video streaming was "narrowly tailored and not broader than necessary to protect the public health." *Zemek*, 310 Cal. Rptr. 3d at 830. The Superior Court offered both visual and audio access to the public. *Compare id.*, *and Ansari*, 48 F.4th at 410, *with Allen*, 34 F.4th at 793. *But see Tarpey*, 2023 WY 14, ¶ 42, 523 P.3d at 929-30 (holding audio-only broadcast did not violate defendant's public trial rights). The Superior Court followed policies established by the Judiciary and recommendations by public health experts, ensuring the closure was "only broad enough to allow for social distancing in the jury." RA, tab 139 at 3 (Dec. & Order). The Superior Court's efforts were reasonable and narrowly tailored to protect public health and safety.

### b.  The Superior Court considered reasonable alternatives.

[58]     The record shows the Superior Court considered reasonable alternatives to the livestream it implemented.  *See, e.g.*, *id.* at 4 ("[M]embers of the public were allowed into portions of the trial that were held in the larger San Ramon Courthouse."); *see also People in Int. of G.B.*, 2018 COA 77, ¶ 44 (observing that "instituting a partial closure might, in some cases, satisfy a court's obligation to consider reasonable alternatives," if the partial closure is narrowly tailored (quoting *State v. Tucker*, 290 P.3d 1248, 1258 (Ariz. Ct. App. 2012))).  We find the Superior Court struck the balance between reducing the risk of COVID-19 while providing Mendiola a fair trial with the "special care" required by *Waller*.  *See Waller*, 467 U.S. at 45; *see also* Stephen E. Smith, *The Right to a Public Trial in the Time of COVID-19*, 77 Wash. & Lee L. Rev. Online 1, 11 (2020) ("Once the court takes notice of the public health crisis, resulting findings flow therefrom, naturally.  Acting to reduce the spread of the virus is an indisputable 'overriding interest.' Maintaining social distance or separation is the necessary means of furthering that interest, and no reasonable alternatives are available.").

### c.  The Superior Court made adequate findings on the record.

[59]     The Superior Court's closure was also based on adequate factual findings, as COVID-19 conditions in Guam would support the closure.  While it is unclear whether the Superior Court began the trial by expressly stating on the record that closure was necessary to protect public health and safety,[8] these findings are apparent in context.  *See* RA, tab 100 (Min. Entry, Aug. 26, 2021); RA, tab 139 at 1-4 (Dec. & Order); *see also Waller*, 467 U.S. at 45 (explaining purpose of findings requirement is to allow review of reason for closure); *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994) ("[S]pecific findings by the district court are not necessary if we can glean

---

[8] Mendiola has not provided the transcripts from the first day of trial.

sufficient support for a partial temporary closure from the record."); *Ansari*, 48 F.4th at 403 ("Because the Sixth Amendment does not require a . . . particularized dissertation to justify a partial courtroom closure that is reasonable, neutral, and largely trivial (i.e., requiring spectators to watch and listen on livestream rather than in-person), the . . . partial closure of [defendant's] jury trial was not unconstitutional.").

[60]    Thus, Mendiola's Sixth Amendment right to a public trial was not violated because the closure was narrowly tailored to an overriding interest, and the court considered reasonable alternatives along with making adequate findings.

## B. The Castle Doctrine, Mendiola's Due Process Rights, and the Superior Court's Findings

[61]    Mendiola next argues the People's presentation of evidence suggested Rios was acting in self-defense under Guam's Castle Doctrine, which impermissibly violated his due process rights. Appellant's Br. at 2-3, 21. We review this alleged due process violation *de novo*. *Diego*, 2013 Guam 15 ¶ 13.

[62]    Guam's Castle Doctrine Act provides a statutory presumption of self-defense if "the person against whom the defensive force was used was in the process of unlawfully and forcefully entering . . . [a] residence." 9 GCA § 7.112(a)(1) (2014). The presumption does not apply if "the person who uses defensive force is engaged in a criminal activity or is using the . . . residence . . . to further a criminal activity." 9 GCA § 7.112(b)(2). The Superior Court found the Castle Doctrine did not apply to Rios because he "was engaged in criminal activity or using the residence to further a criminal activity at the time he pulled out the knife." RA, tab 137 at 3 (Dec. & Order).

[63]    The Superior Court took multiple steps to prevent the People from using the Castle Doctrine impermissibly. The trial court stopped the People from asking Detective Santos, the GPD officer who arrested Mendiola, whether "somebody [should] be able to protect their residence."

Tr. at 19-21 (Jury Trial, Aug. 30, 2021). The court granted Mendiola's motion *in limine*, prohibiting the People from presenting the proposed Castle Doctrine jury instruction or using the Castle Doctrine "as a shortcut to prove [Mendiola] did not act in self-defense." *Id.* at 65; RA, tab 137 (Dec. & Order). The court prevented the People from offering the following jury instructions: "Necessity Defined and Allowed," "Force in Defense of Third Persons: Defined and Allowed," "Force in Defense in Property: Defined and Allowed," "When Force Allowed by §§ 7.94 & 7.96 is Unavailable," and "Home Protection, Use of Deadly Force, Presumption of Fear of Death or Harm." *See* RA, tab 82 at 3, 7-12 (People's Proposed Suppl. Jury Instrs., Aug. 20, 2021); Appellee's Br. at 32-33.

[64]     Nevertheless, Mendiola contends the jury was "tainted" by the "stench of an inverted castle doctrine." Appellant's Br. at 23; Reply Br. at 10. Mendiola asserts the re-enactment video introduced at trial confirmed "essential facts" related to Mendiola's self-defense claim, and the People tried to use these facts to "surreptitiously . . . introduce Guam's Castle Doctrine Act into the[] proceedings as a path to defeat Mr. Mendiola's claim of self-defense." Appellant's Br. at 21-22. He argues "the trial had already been permeated with testimony and discussion about the victim's 'right' to be in the home and defend himself." Reply Br. at 10. Yet, Mendiola merely provides bald citation to four pages of trial transcripts without any explanation of how this testimony constituted an "oblique attack on Mr. Mendiola's claim of self-defense." Appellant's Br. at 8; *see also* Appellee's Br. at 30 (interpreting how the portions of the transcript could possibly support Mendiola's contentions); *State v. Hawkins*, 2016 UT App 9, ¶ 60, 366 P.3d 884 ("Mere bald citation to authority, devoid of any analysis, is not adequate."). Upon review of the challenged testimony, we find no error. *Cf. In re Guardianship of Moylan*, 2017 Guam 28 ¶ 37 ("[Appellant] has failed to articulate how the Wards' due process rights were violated in this case.").

**[65]**    "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "[I]t is the Due Process Clause that wards off the introduction of 'unduly prejudicial' evidence that would 'rende[r] the trial fundamentally unfair.'" *Kansas v. Carr*, 577 U.S. 108, 123 (2016) (second alteration in original) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). On appeal, reviewing courts must consider whether the admission of the challenged evidence so "fatally infected" the proceedings as to violate due process. *Lisenba v. California*, 314 U.S. 219, 236 (1941).

**[66]**    We have acknowledged that "[e]videntiary presumptions that have 'the effect of relieving the [prosecution] of its burden of persuasion beyond a reasonable doubt of every essential element of a crime' are prohibited as a violation of the Due Process Clause." *People v. Cox*, 2018 Guam 16 ¶ 18 (second alteration in original) (quoting *Francis v. Franklin*, 471 U.S. 307, 313 (1985)). Despite the fact no Castle Doctrine instructions were given to the jury, Mendiola argues the challenged evidence supported an impermissible inference that Rios was "presumed to be acting in self-defense." Appellant's Br. at 2-3. We find persuasive the Ninth Circuit's rejection of this type of argument:

> Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.

*Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (internal footnote and citation omitted) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)); *see also Francis*, 471 U.S. at 314-15 ("A permissive inference violates the Due Process Clause only if the suggested

conclusion is not one that reason and common sense justify in light of the proven facts before the jury.").

[67]    Even if the challenged evidence supports an inference that Rios was acting in self-defense against an unlawful invader when he brandished a knife against Mendiola, this is not the only inference the jury could have drawn.[9]  The information obtained through the re-enactment video and elicited by the People was also narrative, relevant to the setting and incident on the morning of Rios's death.  When viewed in context—which Mendiola's bald citation does not provide—the People used the information elicited to establish relationships and background, not to suggest Rios was presumed to be engaged as a lawful actor.  The facts being disputed are "not highly inflammatory but relatively sterile." *Jammal*, 926 F.2d at 920.  Furthermore, another permissible inference the jury may have drawn from the challenged evidence was that Mendiola provoked the use of force by Rios—tending to negate his claim of self-defense.  *See, e.g.*, *People v. McGann*, 230 P. 169, 171 (Cal. 1924) (in bank) ("[I]n case of a deadly encounter, where one party is killed and the survivor claims that the killing was done in self-defense, the question as to who was the aggressor is an issue of vital importance for the consideration of the jury.").  Thus, because there are permissible inferences the jury could have drawn from the evidence Mendiola contests, its admission did not violate due process.  *See Jammal*, 926 F.2d at 920.  We simply cannot say the challenged testimony is "of such quality as necessarily prevents a fair trial." *See id.* (citation omitted).

---

[9] And we are not entirely convinced that such an inference would be impermissible.  Even where the presumption does not apply and a permissive-inference instruction would be error, evidence of a victim's actual self-defense can be presented.  *Cf. United States v. Horob*, 735 F.3d 866, 871 (9th Cir. 2013) (per curiam) ("[I]n cases where the presumption does not apply, the defendant can still present evidence of actual vindictiveness.").  Stated a different way, even where a trial court finds the Castle Doctrine does not apply to a victim, the prosecution may present evidence that the defendant "provoked the use of force against himself in the same encounter." *See* 9 GCA § 7.86(b)(1) (as amended by Guam Pub. L. 32-111:2 (Feb. 10, 2014)).

**C. Mendiola's Self-Defense Claim and the Requirement of Proof Beyond a Reasonable Doubt**

[68]     Finally, Mendiola argues the People's reliance on a *de facto* Castle Doctrine presumption meant Mendiola's self-defense claim was not disproven beyond a reasonable doubt. Appellant's Br. at 3. We disagree.

[69]     Due process requires "[t]he prosecution bear[] the burden of proving all elements of the offense charged and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Perry*, 2009 Guam 4 ¶ 12 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993)); *see also In re Winship*, 397 U.S. 358, 364 (1970); *People v. Kanistus*, 2017 Guam 26 ¶ 26. "As self-defense is a justification defense, once the issue of self-defense has been raised, the prosecution bears the burden of proving beyond a reasonable doubt that a defendant did not act in self-defense in committing any offense." *People v. Gargarita*, 2015 Guam 28 ¶ 14. A trial court must instruct the jury that it is the People's burden to disprove self-defense beyond a reasonable doubt. *Kotto*, 2020 Guam 4 ¶ 39; *People v. White*, 2020 Guam 19 ¶ 16. Failure to do so "erodes a defendant's due process rights." *White*, 2020 Guam 19 ¶ 27.

[70]     Where the jury was properly instructed, the critical inquiry on review is for the sufficiency of the evidence: "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318; *see also Kotto*, 2020 Guam 4 ¶ 30 ("[T]he court must determine whether there is sufficient evidence upon which the jury could find beyond a reasonable doubt that [defendant] lacked justification to use self-defense."). "When reviewing the sufficiency of the evidence, '[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury.'" *Taisacan*, 2018 Guam 23 ¶ 17 (alterations in original) (quoting *People v. Song*, 2012 Guam 21 ¶ 29). Rather, "the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also People v. Guerrero*, 2003 Guam 18 ¶ 13.

[71]     Despite Mendiola's claims about "reliance upon a *de facto* castle doctrine presumption," Appellant's Br. at 3, the jury was correctly instructed on the People's burden to disprove his claim of self-defense beyond a reasonable doubt, RA tab 121 at 60 (Jury Instr. No. 5P, Sept. 2, 2021) ("The People must prove beyond a reasonable doubt that the Defendant did not act in self-defense. In other words, if you have a reasonable doubt whether or not the Defendant acted in self-defense, your verdict must be not guilty."). We therefore review Mendiola's conviction to determine whether there is sufficient evidence that he lacked justification to use self-defense.

[72]     Both Mendiola and the People had the opportunity to present theories regarding what happened on the morning of Rios's death. Mendiola established a case of self-defense by eliciting testimony that Rios was the initial aggressor, *see* Tr. at 108 (Jury Trial, Aug. 27, 2021), that Rios had a violent history, *id.* at 25, 103-04, and that Mendiola reasonably feared for his safety and life, s*ee* Tr. at 13-18 (Jury Trial, Aug. 30, 2021). The People presented evidence contradicting this theory of self-defense by asserting that Mendiola went to get the firearm before Rios threatened him, *id.* at 8; Tr. at 103-04 (Jury Trial, Aug. 27, 2021), that Rios was not a violent individual, Tr. at 44 (Jury Trial, Aug. 27, 2021), that Quidachay tried to get between Mendiola and Rios before Mendiola fired the gun, *id.* at 21, and that Mendiola fired the gun a second time, once Rios was already shot and on the floor, *id.* at 110-11.

[73]     In *People v. Kotto*, we rejected a comparable claim, finding that though the defendant had "put forth a rational argument he acted in self-defense under his characterization of events," when viewing the evidence in the light most favorable to the People, a jury could have rationally

concluded the defendant did not act in self-defense. 2020 Guam 4 ¶¶ 34-35. The evidence presented was "sufficient to contradict any assertion of self-defense beyond a reasonable doubt." *Id.* ¶ 35.

[74]    Similarly, the People here presented sufficient evidence which, if believed by the jury, proved beyond a reasonable doubt that Mendiola was not acting in self-defense when he shot Rios. The People's evidence controverted Mendiola's theory that force was immediately necessary to protect against serious bodily harm and that there was no opportunity to retreat to safety. *See* 9 GCA § 7.86(b)(2) (as amended by Guam Pub. L. 32-111:2 (Feb. 10, 2014)) ("The use of deadly force is not justifiable under § 7.84 unless the defendant believes that such force is necessary protect himself against death [or] serious bodily harm . . . ; nor is it justifiable if[;] . . . the defendant knows that he can avoid the necessity of using such force with complete safety by retreating . . . ."); RA, tab 121 at 61 (Jury Instr. No. 5Q, Sept. 2, 2021). Evidence was offered to prove that Mendiola went to his truck to get the firearm when he heard Rios behind the door, that Quidachay tried to stop the altercation before Mendiola fired the gun, and that Mendiola fired a second shot when Rios was already on the ground.

[75]    While Mendiola has presented a sensible argument that he was acting in self-defense under his characterization of events, we are required to view the evidence in the light most favorable to the People. *See Kotto*, 2020 Guam 4 ¶ 35. The jury was properly instructed that the prosecution must disprove self-defense beyond a reasonable doubt. Viewing the evidence in the light most favorable to the People, a rational trier of fact could have found that Mendiola did not act in self-defense. The evidence is sufficient to contradict any assertion of self-defense beyond a reasonable doubt.

## V. CONCLUSION

[76]     Mendiola did not timely object to the closure of jury selection, thus forfeiting his Sixth Amendment right to a public trial during voir dire.  Although this structural error was clear under existing law, nothing in the record suggests the exclusion of the public led to any unfairness or deviation from established procedures, affected the public interest in the administration of justice, or somehow made the jurors less attuned to the importance of their function.  Even assuming the error affected Mendiola's substantial rights, we decline to exercise our discretion to notice this error because failure to correct it would not result in a miscarriage of justice or threat to the integrity of the judicial process.

[77]     The Superior Court did not violate Mendiola's Sixth Amendment right to a public trial when it closed the trial because the closure was narrowly tailored to an overriding public health interest, and the court considered reasonable alternatives and made adequate findings.

[78]     The Superior Court prevented the People from using the Castle Doctrine as a shortcut to prove Mendiola did not act in self-defense.  Admission of the evidence Mendiola challenges did not so "fatally infect" the proceedings that it violated due process because there were permissible inferences the jury could draw.  The jury was properly instructed on the People's burden to disprove self-defense, and the People offered sufficient evidence for the jury to have found Mendiola did not act in self-defense beyond a reasonable doubt.  We **AFFIRM**.


/s/
F. PHILIP CARBULLIDO
Associate Justice

/s/
KATHERINE A. MARAMAN
Associate Justice


/s/
ROBERT J. TORRES
Chief Justice